196 So.2d 598 (1967)
Tim WEST
v.
HYDRO-TEST, INC., et al.
No. 6962.
Court of Appeal of Louisiana, First Circuit.
March 13, 1967.
*600 Robert D. Morvant, Thibodaux, for appellant.
Joseph L. Waitz, of O'Neal & Waitz, Houma, for appellees.
Before LANDRY, ELLIS and BAILES, JJ.
LANDRY, Judge.
Plaintiff, Tim West, a roughneck in the employ of John W. Smith Well Service, Inc. (Smith), prosecutes this appeal from a judgment dismissing his action in tort against Hydro-Test, Inc. (Hydro), a concern engaged by General American Oil Company (American) to test the pipe and tubing on a well belonging to American and being reworked by plaintiff's employer, Smith, pursuant to a contract with American. Initially plaintiff instituted suit against Hydro, James H. Taylor, Jr., its foreman in charge of the testing operation, and its insurer, Fireman's Fund Insurance Company (Fireman's). Subsequently plaintiff joined as defendants Reed Roller Bit Company (Reed) and its insurer, The Travelers Insurance Company (Travelers), on the premise that certain testing equipment manufactured by Reed and employed at the time of the accident was defective and contributed to plaintiff's injury. We find that the trial court correctly resolved all issues and properly dismissed plaintiff's action.
For a cause of action against Hydro, its aforesaid employee and insurer, plaintiff alleged the accident occurred September 5, 1962, at approximately 4:40 A.M., in the vicinity of South Coast #2 Well, Valentine Field, Lafourche Parish, while plaintiff was in Smith's employ. Plaintiff averred the accident happened while he was in the course of assisting Taylor in testing well tubing by means of an instrument known as a "test tool", which was being hoisted into position to be lowered into the well by way of a device referred to as an "overshot." In essence plaintiff averred Taylor negligently assembled and coupled the overshot causing it to come apart resulting in the test tool being dropped to the floor of the derrick and striking petitioner on the head.
Traders and General Insurance Company (compensation insurer of Smith) intervened in plaintiff's suit against Hydro, Taylor and Fireman's to recover compensation benefits paid plaintiff. All defendants then third partied Reed which sold the overshot to Hydro contending the article was defective and Reed breached its warranty which guaranteed the equipment suitable *601 for its intended purpose, thus exposing Reed to liability for selling an object with latent defects. Alternatively, said third party plaintiffs sought recovery from Reed under the doctrine of res ipsa loquitur. Defendants likewise denied any negligence on the part of Taylor and alternatively plead plaintiff's contributory negligence.
More than one year after filing his original suit, plaintiff amended his petition to include Reed as defendant on the ground the overshot used at the time of the accident was negligently designed and manufactured by Reed which circumstance combined with the asserted negligence of Taylor thus rendering Reed liable as a joint tort-feasor. Reed answered denying any negligence whatsoever on its part, and prayed that the demands of all third party plaintiffs as well as those of plaintiff West be rejected and dismissed. In defense of West's claim against it, Reed and its insurer alternatively plead contributory negligence and filed an exception of one years prescription. Plaintiff's action against Hydro, Taylor and Fireman's was eventually compromised and the suit against those defendants dismissed. The case against Reed and its insurer proceeded to trial resulting in judgment in favor of defendants.
Appellant's case against Reed and Travelers is predicated on two basic contentions, namely, res ipsa loquitur and, alternatively, negligence.
As regards the argument that res ipsa loquitur is applicable herein, appellant contends simply that the overshot which allegedly contributed to the accident was a dangerous instrumentality; that appellant does not know the precise cause of the accident and that Reed is therefore called upon to exculpate itself from the presumption of negligence which attaches under such circumstances. The alternative contention of negligence is based on the dual premise (1) that the overshot was negligently designed and manufactured and alternatively (2) the device was designed only for vertical lifting and Reed was negligent in failing to inform purchasers and foreseeable users of the nature and limitations of the device by brochures, labels attached to the instrument or other appropriate means of instruction and failing to warn prospective users, by similar means, of the hazards incident to use of the instrument for any purpose other than that for which it was intended.
Since this action arises over the uses of a highly specialized piece of oil field equipment, a detailed explanation of the device together with the circumstances under which it was used at the time of the accident, is necessary to a proper understanding of the issues herein presented for determination.
American desired to rework one of its wells and engaged Smith's services for that purpose. The procedure required insertion of tubing into the well for making certain tests preparatory to which each joint of the tubing itself was tested for leaks. Hydro was engaged to make the necessary tubing tests as well as certain other checks. To perform the required tests a contrivance known as a "test tool" was employed. The record does not make it entirely clear just how a test tool is constituted but we shall explain our version of the device as we glean an understanding thereof from a rather painstaking review of the testimony.
We understand that after tubing has been joined together and lowered into a well being reworked each seam or joint is then tested for leaks. To make the test, a test tool is lowered into the hole inside the tubing, the test is then made and the tool withdrawn and readied for testing the next seam or joint. It is possible, however, to rig a test tool that will check more than one joint or seam in a single insertion of the instrument. On any given check, therefore, the length and composition of the tool depends upon whether one or more joints is to be tested on that particular examination. We also understand that the individual lengths of tubing being *602 placed in this particular well was approximately thirty feet. It further appears a test tool is made up of the testing device itself and, inter alia, contrivances known as "sucker rods" which we understand to be metal rods of varying lengths which can be joined to the test tool and to each other in order to make the entire assembly the required length for the particular test and space the test tools the required distance when more than one joint is tested in a single insertion of the testing apparatus. After the tool is thus assembled, it is then attached to a device known as an "overshot" which in turn is affixed to a cable secured to a winch on a truck. By this means the entire assembly is then lowered into the well inside the tubing to the depth of the joint to be tested or to such other point in the well at which some test of another nature is to be made.
On the occasion in question the test tool with overshot attached was assembled on the floor of the rig and lay horizontally on the deck. Witnesses variously estimated the tool in question as being from thirty to sixty feet in length and weighing from 85 to as much as three or four hundred pounds. We find the evidence preponderates in favor of the conclusion the tool in question was fabricated as what is known in the trade as a "short rig" which means it was of a length customarily employed to check a single joint. The particular test being made, however, was the probe of a special device known as a sliding sleeve, the precise nature and function of which is not essential to a determination of any issue herein. We also find the tool in question probably weighed approximately 125 pounds, although this determination is not vital as will hereinafter appear.
Irrespective of its composition, it was necessary to raise the tool to a vertical position so that the end opposite the overshot could be inserted in the tubing following which the entire mechanism would then be lowered to the desired depth by means of the cable attached to the overshot on the upper end. While the tool was being raised from its horizontal position on the deck, when the overshot end reached an elevation of approximately forty-five degrees and the opposite end was still in contact with the floor, the overshot parted causing the remainder of the tool to fall with a whipping motion and strike plaintiff on the head inflicting most serious injuries.
The evidence establishes beyond doubt that an overshot is designed and intended for vertical lifting; its original use being to lift test cores from wells during the drilling process. It is also shown that the device has been in use and operation in the oil industry at least since the 1930's. It is undisputed that it is a standard tool or instrument found on all drilling rigs and numerous reworking rigs such as the one on which plaintiff was injured. That it is a tool commonly and customarily used in the oil industry is not open to question from the record. As we understand the construction of an overshot, it is formed of two basic components, one known as the "overshot" or female portion and the other known variously as the "dog knot", "doughnut", "sub pick up part" or male part. The female part is likened to a bottle with the bottom knocked out. It is approximately 18 inches in length and varies in dimension on the small end (or end equivalent to the neck of the bottle) from one to two inches depending upon whether one desires a small or large overshot. The open end of the female part is equipped with jaws, springs and pins which when properly adjusted and united with the sub part exert a clamping or holding force. One end of the dog knot is fashioned such that it inserts into the jaws of the female portion, which by aid of the springs and jaws affix thereto joining the two together as a single unit. The other end of the sub part is attached to the assembled tool. With the overshot thus joined together and affixed to the tool, the entire device is then raised by means of the cable attached to the neck *603 end of the overshot and thusly placed in vertical position to be lowered into the well.
Adverting to the circumstances of the accident, we note first the testimony of Ronald Joseph Toups, derrick man for Smith. He explained that Hydro had been putting pressure into the tubing to check for leaks. He recalled that just before the accident it became necessary to lengthen the tool and after having made the adjustment the device was being lifted from its horizontal position on the floor of the rig. According to Toups, the sub pick up parted from the overshot when the assembly attained an angle of 30 degrees. At the moment of the accident, he, Toups was holding the end on the floor to guide the tool to the desired point. Toups also recalled that during that particular tour of duty, the overshot disconnected on three other occasions, each time while the mechanism was engaged in a vertical lift.
James H. Taylor, Jr., Hydro's operator in charge of proceedings, testified he was operating the winch with which the tool was being lifted. Before commencing the lifting, he warned everyone present to stand clear as he considered the operation dangerous. His sole duty was to maneuver the tool from its horizontal position on the deck into the well tubing. He stated the tool was approximately 30 feet in length and that it had been raised to an angle of 45 degrees when the sub part disengaged from the overshot. He also recalled that plaintiff was in a safe place but stepped forward just before the accident occurred.
C. A. Hadley, an employee of Smith, testified he purchased the overshot in question together with springs, jaws and pins, as a package, from defendant Reed in Houston, Texas. This particular overshot was the newest one in Mr. Hadley's stock and had been used for about a year prior to the accident. Hadley himself rigged the test tool which was involved in the accident. He also testified that the same overshot was still in use by his concern and being used in testing procedures at the time of trial. After the accident he examined the overshot and all its components and found it to be in good working order and condition. He also testified that as the job progressed the test tool was increased in length from approximately 30 to about 70 feet and recalled it was 40 feet long at the time of the accident.
John W. Smith, owner and president of Smith, testified to 30 years experience in the oil industry. He stated he ran a string of tubing into the well and that it was necessary to test each joint or union. According to Smith the test tool was used for the required testing. He also testified that Hydro and Smith worked in cooperation with each other on this undertaking. Smith further stated he was familiar with an overshot, had used them for years and that it was not designed for horizontal lifting because in such an operation the stress and strain placed on the jaws and springs of the overshot caused the device to prize itself out of the sub-part or dog knot when it was employed to lift anything at an angle. He acknowledged he never saw an overshot uncouple in that manner prior to the accident, and added that an overshot was seldom used in that fashion, that is, picking up a test tool at an angle. He was of the opinion it would have been safe to lift the tool horizontally but not at an angle because the coupling between the overshot and sub-part made a stiff connection and angle lifting placed too much stress and strain on the union. Smith also testified that since the accident it has become the practice to use safety chains when using an overshot to do lifting of the kind involved when plaintiff was injured.
In disposing of plaintiff's contention the doctrine of res ipsa loquitur is applicable to the instant case, certain well established principles governing the pertinency of the doctrine must be borne in mind. It is now well settled that the principle in question is to be applied only to accidents occurring under circumstances wherein the injured petitioner cannot reasonably be expected *604 to know the cause of the mishap and involving events which do not ordinarily occur except for negligence on someone's part. Larkin v. State Farm Mutual Automobile Insurance Company, 233 La. 544, 97 So.2d 389; Minton v. Continental Insurance Company, La.App., 110 So.2d 789. In essence the doctrine is a rule of evidence predicated on the theory that the circumstances of the accident give rise to the inference of negligence, yet still do not modify the fundamental rule that negligence will not be presumed. Application of the rule does not relieve plaintiff of the burden of proving negligence; it merely gives rise to a presumption in favor of plaintiff in the nature of an advantage which defendant is required to offset because of defendant's superior knowledge and control of a dangerous instrumentality causing or the circumstances attending the accident. Larkin and Minton cases, supra.
Recently in Day v. National U. S. Radiator Corporation, 241 La. 288, 128 So. 2d 660, our Supreme Court has stated that res ipsa loquitur is a rule of evidence the applicability of which is to be determined at the end of the trial after all evidence has been introduced. When applicable, the doctrine makes out a prima facie case of negligence on defendant's part which presumption defendant is called upon to rebut. Day v. National U. S. Radiator Corporation, supra, Gerald v. Standard Oil Co. of La., 204 La. 690, 16 So.2d 233. The principle, being a qualification of the general rule that negligence is not to be presumed but must always be affirmatively established, is to be applied sparingly only in those instances wherein the demands of justice make its application essential. Day v. National U. S. Radiator Corporation, supra, and cases therein cited.
Actual or constructive control by defendant of the instrumentality causing the injury is an essential element of the principle of res ipsa loquitur. Northwestern Mutual Fire Association v. Allain, 226 La. 788, 77 So.2d 395, 49 A.L.R.2d 362; Prosser on Torts, Sec. 30 (3rd Ed. 1964).
The numerous cases cited by counsel for appellant in support of the contention res ipsa loquitur is applicable to the case at bar are readily distinguishable from the instant matter. In each of the quoted authorities the instrumentality involved was either under the control of defendant or the circumstances were such that defendant was responsible for exercising control of the instrumentality at the time of the accident.
We acknowledge an important exception exists with respect to the requirement of control by defendant over the instrumentality causing the injury. Even though defendant is not in actual or constructive control of the instrumentality at the time of the accident, defendant may nevertheless be held liable where it is shown the device or product is defective, if it can be shown the instrumentality or device was not tampered with by anyone through whose hands it passed from the time of its manufacture until the injury. Plunkett v. United Electric Service, 214 La. 145, 36 So.2d 704, 3 A.L.R.2d 1437. In the Plunkett case, supra, the Supreme Court announced the rule that in such instances it is important that plaintiff establish freedom of fault on the part of all through whose hands the instrumentality passed after it left defendant's possession or control.
Also germane to the issue at hand is the principle that where the evidence shows the accident may have occurred as the result of one of two or more causes, res ipsa loquitur is not applicable. Morales v. Employers' Liability Assur. Corporation, 202 La. 755, 12 So.2d 804.
In the case at bar it is readily observed that defendant Reed had no control whatsoever over the instrumentality which caused plaintiff's injury, having sold the overshot about one year before the accident. The testimony of Hadley and other witnesses shows the overshot in question had been purchased by Hydro from Reed *605 approximately one year prior to the accident. During this entire time it was exclusively under Hydro's control and had been used on various jobs. For this reason alone the doctrine of res ipsa loquitur is not applicable herein.
Moreover, it appears from the evidence of numerous witnesses that with use the springs of the overshot lose tension and the jaws wear smooth thus requiring replacement from time to time to insure proper functioning of the device. To insure its proper operation it is necessary that replacement of said parts be effected by the user when necessary. It is also shown that if the overshot is not properly coupled with the sub-pick up when being used for lifting, the union will not hold. While the evidence shows that examination following the accident disclosed the overshot to be in good working order, it is entirely possible the device parted because it was improperly coupled. Under such circumstances we do not find this a proper instance for invocation of the rule of res ipsa loquitur. Morales v. Employers' Liability Assur. Corp., supra.
We find no basis in the record in support of appellant's contention Reed was negligent in the design or manufacture of the overshot and thus placed on the market an instrument containing latent defects inherently dangerous to foreseeable users.
On the contrary, the evidence shows the device had been in use for many years and was a standard tool on oil rigs, particularly drilling rigs. The testimony of John W. Smith, James H. Taylor, Jr., C. A. Hadley, Etienne Joseph Adams (a driller with 17 years experience in oil field work), Ronald Joseph Toups (who was assisting in the test) and L. C. Wright (an employee of Hydro for many years) demonstrates beyond doubt the tool in question was made in accordance with a design proved efficient by years of acceptance in the industry. All were thoroughly familiar with the device, having used one on innumerable occasions. Most of said witnesses examined the particular overshot following the accident and found nothing whatsoever wrong with it. It was noted that the jaws were not worn and the springs still retained normal tension. Moreover, following the accident the same overshot was used to complete the tests being conducted without replacement of any of its component parts. We are convinced from the evidence that the tool in question, as well as innumerable counterparts thereof made by Reed, have been in constant use in the oil industry for many years and that, contrary to being defective in design or manufacture, overshots in general and the particular one involved in this litigation were accepted and used by the industry with confidence and trust in the product. More particularly the record is devoid of testimony establishing that the overshot in question was in any way defective or contained any latent defect making it an inherently dangerous instrumentality.
There remains the argument that Reed is liable because of its negligence in marketing an inherently dangerous instrumentality without acquainting foreseeable users of its alleged latent defects. In this connection appellant's argument is substantially that the instrument when sold was not accompanied by any written literature, pamphlet or brochure explaining its use and neither did it have attached to or imprinted thereon a set of instructions indicating its primary function to be a vertical lifting instrument and warning users that a "ring" or chain was essential to safety in the event the device was used for horizontal lifting.
In so contending appellant relies principally upon the testimony of Hadley (Smith's Lafayette Division Manager) and R. E. Sjoberg (Gulf Coast Division Manager of Smith), who stated in substance that during their years of service neither had ever seen a brochure, pamphlet or other written form of instruction from Reed regarding the function and use of an overshot. They *606 further deposed that at no time had either received any oral instruction in the use of the instrument from any salesman, employee or representative of Reed.
It appears, however, that overshots are and have been (virtually since their invention) advertised in Reed's own brochures and catalogues with a full and complete explanation of their design, function, use and capabilities. It further appears that Reed's catalogues as well as the oil industry catalogue are kept in Smith's various offices from which parts and instruments are ordered, as needed.
The testimony of John W. Smith shows he was thoroughly familiar with the device and was aware it was designed primarily for removal of well cores by vertical lift. Mr. Smith's testimony (and that of certain other witnesses) also reveals that Reed designed and sold a "ring" intended for use when an overshot was employed for horizontal lifting. The ring, it is shown, prevents the sub-pick up portion from separating or parting from the female portion when used for a horizontal lift. It is clear that in the present case no ring was used even though the test tool was being lifted horizontally.
We recognize that the manufacturer of a dangerous instrumentality is obligated to warn foreseeable users of the limitations of a product when use beyond its limitations may be fraught with potential perils. However, such rule is without application in those instances wherein the injured party either knows or should know of the limitations and restricted capabilities of the article. Sawyer v. Pine Oil Sales Co., 5 Cir., 155 F.2d 855. The instant case falls squarely within the ambit of the Sawyer decision, supra. In the present case, all parties on the rig, including plaintiff, were experienced in the undertaking in which they were engaged. All had used overshots for years and either knew or should have known that the device was not to be used for horizontal lifting without taking certain precautions. It is shown that overshots in general and this one in particular had been customarily used for all sorts of lifting, in some instances by using rings, in others by using a safety chain and in still others (as in the present) for both vertical and horizontal lifting without using either rings or chains. If Hadley, Sjoberg, or any other employee of Smith, was not aware of the limitations of the device, it was simply because none had ever read the instructions published by Reed in its catalogue. That they may have been remiss in this regard is no fault of Reed. Moreover the manufacturer's duty to warn does not extend beyond the foreseeable purchaser which in this instance would be Smith. McKay v. Upson-Walton Co., 7 Cir., 317 F.2d 826. Therefore if the manufacturer warns the purchaser, or if the purchaser has knowledge of the danger, the manufacturer is not liable to third persons who may be subjected to the danger. McKay v. Upson-Walton Co., supra.
Nor do we find any negligence on the part of Reed in failing to attach written or printed instructions on each and every instrument sold. From our observation of the device such procedure would be most impractical. These devices are placed on rigs and left exposed in all sorts of weather. Written instructions affixed thereto would be of short duration. Moreover, the device is so constructed that each of its working parts is readily available for inspection. It is so made that an experienced operator can determine at a glance the manner in which it is intended to operate. There are no hidden parts, the principle on which it works can easily be determined from simple examination. No part of the mechanism is so constructed as to conceal its method of operation or disguise a latent defect or danger
Doyle v. Fuerst & Kraemer, 129 La. 838, 56 So. 906, 40 L.R.A.,N.S., 480, relied upon by appellant is without application to the case at hand. The Doyle case, supra, was a tort action seeking damages for ptomaine poisoning contracted when plaintiff ate *607 certain cakes made at defendant's establishment. The warranty of the fabricator and vendor of foods is by the nature of things most stringent and the jurisprudence in general exacts a high degree of care of the vendor of products designed for human consumption. See Musso v. Picadilly Cafeterias, Inc., La.App., 178 So.2d 421, and cases therein cited.
The views expressed herein eliminate the necessity of our considering Reed's exception of prescription and affirmative defense of contributory negligence.
Accordingly, the judgment of the trial court is affirmed at appellant's cost.
Affirmed.