BRADCO OIL & GAS COMPANY,
Plaintiff-Appellant,

v.

YOUNGSTOWN SHEET AND TUBE
CO., and Hydril Co., et al.,
Defendants-Appellants.

No. 75–1483.

United States Court of Appeals,
Fifth Circuit.

June 1, 1976.

Joseph L. Waitz, Houma, La., Fred A. Collins, Ray Carlton Muirhead, Houston, Tex., for plaintiff-appellant.

John V. Baus, New Orleans, La., John L. Lanier, Thibodaux, La., for Youngstown Sheet, etc.

Before DYER, CLARK and GEE, Circuit Judges.

CLARK, Circuit Judge:

This Louisiana products liability case presents only two questions for appellate resolution: whether the trial court's find-

ings of fact were clearly erroneous and whether the proper legal standard was applied. The district court's extensive fact-findings are supported by the record and in granting judgment for the defendant, the court correctly applied the relevant Louisiana tort law principles. We affirm.

Bradco Oil and Gas Company (Bradco) purchased high-strength tubing (P–105) from the manufacturer, Youngstown Sheet and Tube Company (Youngstown), for use in drilling an exploratory or "wildcat" oil and gas well in LaFourche Parish, Louisiana. Bradco personnel selected the type of tubing desired and provided the specifications. The well was completed in January 1969, determined to be a producer and shut in four months pending a pipeline connection. During this period, the tubing held well pressures without difficulty. While being flowed for testing on May 16, 1969, the tubing fractured at a depth of approximately 1,500 feet. Salvage operations were unsuccessful and the well was finally plugged and abandoned on July 18, 1969.

Bradco sued for damages resulting from the loss of the well ($1,500,000), claiming that Youngstown sold it a product that was unreasonably hazardous for normal use. Youngstown's chief defense was that the break occurred as a result of embrittlement of the pipe caused by the presence of hydrogen sulfide at the wellsite. At the bench trial, the court received testimony from several experts on both sides, including metallurgists and petroleum engineers. No pertinent tests for $H_2S$ had been conducted at the wellsite and Bradco employees had never detected the substance by odor. However, defendant made its case for the presence of $H_2S$ by the testimony of experts who had examined the failed piping and had positively tested a replacement well located 400 feet from the original site. From this proof, the court found that $H_2S$ was present, although in quantities not readily detectable by smell. Since the hard P–105 tubing chosen by Bradco was susceptible to $H_2S$ embrittlement, the court concluded that "the well was lost more likely as a result of hydrogen sulfide embrittle-

ment rather than any negligence of defendants and/or defects in the tubing caused by the manufacturing process."

Throughout its appellate brief, Bradco challenges particular factfindings involving the presence vel non of $H_2S$. Without detailing each assignment of error, it suffices to state that the lower court's findings on causation are not clearly erroneous. Fed.R.Civ.P. 52(a). The court sifted through the sometimes conflicting scientific evidence and permissibly weighted the expert testimony. These findings cannot be disturbed on appeal.

Bradco's chief complaint involves a question of law. Conceding arguendo that $H_2S$ was the cause of the loss, plaintiff urges that Youngstown had a duty to warn the purchasers of its product that P–105 tubing could be dangerous when used in wells containing even trace quantities of $H_2S$. The problem stems from a rule-of-thumb (the so-called "smell test") commonly used in the South Louisiana oil industry. Bradco's experts testified that it was an accepted practice that if $H_2S$ could not be detected by odor, no $H_2S$ analysis was made because it was not considered a problem. Unfortunately, the proof in this case demonstrated that even non-detectable amounts of $H_2S$ can cause embrittlement in high-strength tubing. Since Youngstown provided no direct warning and Bradco, relying on the absence of a distinctive odor, failed to conduct a chemical test for $H_2S$, the question then becomes whether Youngstown had a duty to provide a double warning, i. e., that P–105 tubing was unsafe for use in an $H_2S$ environment and that the "smell test" was an inadequate means to assure safe use.

Fairly recently, the Louisiana Supreme Court adopted a species of strict liability in product liability cases. Weber v. Fidelity & Casualty Insurance Co., 259 La. 599, 250 So.2d 754 (1971). The general rule is that a manufacturer is presumed to know the defects of his product and will be liable if his goods prove unreasonably dangerous for normal use. Id. at 755. As a corollary to this rule, Louisiana courts have stated that if a product cannot be safely used in

certain foreseeable ways, then the manufacturer is under a duty to fully warn the consumer of the particular dangers involved. *See Rey v. Cuccia*, 298 So.2d 840 (La.1974); *American Guaranty & Liability Insurance Co. v. Little*, 328 So.2d 706 (La. App. 3rd Cir. 1976). Despite this liberal standard, however, Louisiana does not hold a manufacturer is compelled to warn sophisticated purchasers of dangers of which the buyer either knows or should be aware. *See Thibodaux v. McWane Cast Iron Pump Co.*, 381 F.2d 491 (5th Cir. 1967); *West v. Hydro Test, Inc.*, 196 So.2d 598 (La.App. 1st Cir. 1967).

■ The last stated legal principle controls this case. Bradco personnel admitted that they generally recognized the potential hazard of $H_2S$ embrittlement with the P–105 pipe they themselves specified. Indeed, the problem had been discussed in industry publications and developers had been warned by the American Petroleum Institute to pre-test new areas, such as the one in which this well was drilled, for the potentially corrosive substance. Of course, we do not suppose that the Bradco people used the "smell test" actually knowing that it was inadequate. However, from the testimony adduced, the district court could reasonably conclude that Bradco as an experienced oil and gas producer was chargeable with the knowledge that even trace quantities of $H_2S$ could create a hazard. Bradco not only specified the pipe, but also controlled the entire operation. The loss resulted from an improper selection of materials coupled with the failure to conduct a specific test for $H_2S$. Both these deficiencies are directly attributable to Bradco, not Youngstown's failure to warn.

In affirming the district court, we in no way suggest that contributory negligence is a defense to a products liability action in Louisiana. *See Hastings v. Dis Tran Products, Inc.*, 389 F.Supp. 1352 (W.D.La.1975). We merely hold that under the unique facts of this case, the manufactured product possessed no inherent defect and the defendant was not required to give Bradco any information in addition to that generally known in the industry to protect against use under adverse well conditions of which Bradco was aware, or at least should have been aware.

Bradco's final challenges to the district court judgment merit little discussion. Its complaint that the court took "judicial notice" of the presence of $H_2S$ at the lost wellsite is misleading. The judicial notice comment made by the judge during the trial merely indicated an agreement with defendant's contention that it was possible for traces of $H_2S$ to exist at the site without showing up on Bradco's gas composition tests which were not designed to detect minute qualities of $H_2S$. The presence of $H_2S$ at the wellsite was proven by defendant's expert witnesses. There was no necessity to take judicial notice of this crucial fact and the record reveals that the district court never intended and in fact never acted to relieve Youngstown of its burden of proof on this issue.

■ Likewise, Bradco's contention that the court erred in excluding rebuttal evidence of an analysis of a liquid sample taken from the wellsite provides no reason for upsetting the judgment below. In January 1969, one of Bradco's investors (not a chemist or engineer) dipped a sample of well fluids from a container near the well. He testified he kept this fluid in a plastic bottle in a closet in his office for four years before it was analyzed. Plaintiff's own evidence indicated that any tests done on the substance four years after collection would be unreliable. Additionally, Bradco never attempted to introduce its testimony on this sample until the last day of trial and, by failing to preserve any portion of the sample tested, denied defendant any opportunity to conduct its own test. Under these circumstances, it was clearly within the court's discretion to exclude the chemical analysis of the sample.

AFFIRMED.