Arnetta **POLAND**

v.

**BEAIRD–POULAN et al.**

Civ. A. No. 78–1511.

United States District Court,
W. D. Louisiana,
Shreveport Division.

Jan. 31, 1980.

Glen H. Smith, Shreveport, La., for plaintiff.

Sidney E. Cook, Cook, Clark, Egan, Yancey & King, Shreveport, La., for defendant.

A. J. Gregory, Jr., Mayer, Smith & Roberts, Shreveport, La., for intervenor.

RULING FROM THE BENCH

STAGG, District Judge.

In normal times and in normal cases, when the testimony and the arguments were completed, the court would request briefs, and everybody would have thirty days to write a brief, then ten days to answer; finally, some time would be spent to prepare an opinion. With the current state of this court's docket, however, rulings from the bench have become the means by which this court announces its findings of fact and conclusions of law. There are pending on the docket for this judge 415 civil cases of all kinds, and a number of criminal cases. There is not time to stop and write an erudite opinion.

Therefore, these are the court's findings of fact and conclusions of law.[1] Anyone who would like to see them in written form will have to ask Mr. Hogan[2] to transcribe them.

The plaintiff, Arnetta Poland, a resident of Castor, Louisiana, filed this law suit on November 21, 1978, alleging that on No-

1. This ruling is not a verbatim transcript of the court's bench ruling, but is an edited version of the court's oral disposition. No substantive changes have been made. The editing was merely to ensure readability.

2. William O. Hogan, Official Court Reporter, Western District of Louisiana, Shreveport Division, P. O. Box 441, Shreveport, LA 71161.

vember 24, 1977, he was injured by a defectively designed and manufactured chain saw. The saw was manufactured by Beaird-Poulan, a division of Emerson Electric Company, a Missouri corporation.

Mr. Poland claimed that the "malfunctioning of the chain saw" caused the amputation of the first three toes on his right foot and a soft tissue injury to his right knee. He claims that for these injuries the defendant, as the manufacturer of the chain saw, is strictly liable.

On December 13,1978, the defendant answered the suit denying that its product is defective, and asserting that the plaintiff was contributorily negligent and that he assumed the risk of injury from the chain saw.

These facts are established by a preponderance of the evidence:

1. Arnetta Poland is an adult male, now 43 years of age. Since he was 10 years old, the plaintiff has been involved in timber or pulpwood operations in the Castor, Louisiana-Bienville Parish area. At the time of his injury two years ago, Mr. Poland was employed by the B. C. & S. Wood Company as a foreman of a pulpwood-cutting crew. As the foreman of this crew, it was Mr. Poland's duty to see that all chain saws and other equipment used in the harvesting of pulpwood were properly repaired and maintained.

2. On November 24, 1977, Mr. Poland suffered the amputation of the distal phalanx of his big toe and the second and third toes on his right foot, and a soft tissue injury in the area of his right knee. The injury occurred between 8:30 and 9:00 O'Clock on Thanksgiving morning in 1977. Because of an injury to another worker in his crew, Robert L. Patterson, which occurred the previous week, the plaintiff was short-handed and was assisting the crew in cutting trees. He testified that he had cut two trees, had made his first cut on the front side of the third tree, and was proceeding to make a lower cut on the backside of that third tree when the chain saw kicked back toward his face. Mr. Poland stated that he knocked the saw down to the ground where it came in contact with his lower leg and his foot.

Plaintiff was using a Poulan Model 4200 Chain Saw equipped with a bow chain which, according to the serial number, was shipped from Beaird-Poulan in June of 1975. The chain saw used in this instance is a piece of industrial machinery designed to harvest timber and is for use by professional woodcutters. In plaintiff's version of the accident, the trigger handle or the rear handle of the chain saw became separated from the motor-bow portion of the saw, causing it to dip down, and causing the plaintiff to lose control of the saw. However, the evidence shows that when his employer, Mr. Sam Pullig, asked for the information needed to fill out the insurance claim form, the plaintiff made no mention of the alleged mechanical problem of the saw coming apart, but merely stated that the saw hit a bush and kicked back while it was being used to cut the tree. The plaintiff rather disingeniously attributes this prevarication to his fear that he would not receive workmen's compensation if he told the truth. This affects to some degree the credibility findings by the court as to this witness.

3. It is unclear to this court what defect the plaintiff asserts existed in this chain saw. The court will assume that the plaintiff is arguing that the six vibration isolators (bushings) which served as the shock absorbers were defective. The isolators are installed as shock absorbers between the handle and the user's hand as well as the vibrating gasoline tank, and the engine of the saw. Apparently, Mr. Poland claims that these "worn-out shock absorbers" caused the chain saw to come apart and to injure him.

4. According to the testimony of Mr. Michael L. Gililland, the defendant's expert who participated in the design of the Model 4200 Poulan Power Chain Saw, if all of the isolators were cut in half, and then put back in the chain saw, it still would not cause the handle to separate from the saw or even substantially increase the amount of play between the handle and the body of the

saw. This expert testified that worn isolators could not cause the accident in the manner described by Mr. Poland. He stated that the throttle linkage would hold the saw together as would the choke mechanism. All of these parts had to be undone in order to take the handle apart, even if one had taken out all of the screws holding the handle together. Mr. Gililland was of the opinion that as long as the isolators remained in the casing of the saw, the saw would not come apart.

The isolators were also studied by the plaintiff's expert, Dr. Tabony. His testimony was based on an examination of plaintiff's Exhibit No. 3. There are three sets of bushings: one toward the front, one near the top of the handle, and one near the middle of the handle by the gas tank assembly. Plaintiff's expert believed that if the back set and the front set failed, and the middle set remained secure, the saw would pivot. However, Dr. Tabony testified that when he cut through the front and the back sets of bushings during his testing of the saw, the handle did not separate.

In passing, it should be noted that both Dr. Tabony and Mr. Gililland possessed educational qualifications in their respective fields. Dr. Tabony had a Ph.D. in mechanical engineering, and his field of expertise was metallurgical engineering. By his own testimony, which was rather candid, he had only marginal experience with chain saws of any type. With regard to Mr. Gililland, the evidence clearly showed that, while he had an electrical engineering degree from Louisiana Tech, he had worked in the field of chain saw design and product safety. He was also the supervisor of the laboratory where the design and drafting of chain saws take place. He took part in designing this same Model 4200 saw, and has been in the designing end of chain saws since he graduated in 1973.

■ The admission or the exclusion of expert testimony is a matter left to the sound discretion of the trial court. The United States Supreme Court, in *Salem v. United States Lines Co.*, 370 U.S. 31, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962), held that

the decision to admit or exclude expert testimony is one of the discretionary duties of the trial judge. This court's decision to qualify one as an expert in mechanical engineering, but to refuse to give him the imprimatur of an expert on chain saws, or any particular mechanism, is also backed by substantial authority from the Fifth Circuit.

In *Perkins v. Volkswagen of America, Inc.*, 596 F.2d 681 (5th Cir. 1979), the Fifth Circuit held that the omission or the exclusion of expert testimony is a matter left to the discretion of a trial judge, and that the decision will · not be disturbed on appeal unless it is manifestly erroneous. *Accord Salem, supra; Keystone Plastics v. C. & P. Plastics*, 506 F.2d 960 (5th Cir. 1975); *Stancill v. McKenzie Tank Lines*, 497 F.2d 529 (5th Cir. 1974), and Rule 702 of the Federal Rules of Evidence. In *Perkins*, the court permitted a specialist in mechanical engineering, who had no experience in designing entire automobiles, to express an expert opinion on general mechanical engineering principles. The court did not allow him to testify as an expert in automotive design. This is very close to the language this court used in refusing to allow Dr. Tabony to testify as an expert in chain saws. Chain saw design was not his field of specialized knowledge.

■ This court jealously guards the title of "expert witness". All lawyers, when they present an expert witness, qualify him by questions: "Have you ever testified in court as an expert witness; if so, where?" How many judges without intending it have launched the first, the second, the third, or the fourth missile, allowing a man to go to the fifth court and say, "Yes, sir, I have been qualified as an expert in court by four other judges."? Therefore, it is clearly the duty of every court and each judge to limit the launching of experts to those who are truly able to testify with the necessary expertise. One cannot testify as an expert in regard to a mechanism if he has not had ample opportunity to practically apply his field of expertise to the mechanism at issue. In this case, a gasoline-powered, industrial chain saw is the mechanism at issue.

5. Mr. Gililland's testimony established that no industry standards existed in 1975. The plaintiff's Exhibits Nos. 5 and 6 are chain saws on which 150,000 man hours were spent in design and testing. Mr. Gililland stated that the Model 4200 saw met and exceeded the state of the art as it existed in 1975, the date it was first manufactured. With this conclusion, this court is inclined to agree.

6. The court also finds that Beaird-Poulan maintains extensive ongoing testing of their chain saws, both in the field and in the laboratory. Pursuant to that testing, there has been a change in the shape of these isolation dampeners from a cylindrical shape to an hour glass shape. There has also been a change in the type of material used to manufacture the isolators. However, it bears repeating that the isolators only serve to absorb the vibration between the engine and the handle. According to the testimony of Mr. Lois Pratt, an independent chain saw repairman and a dealer in Poulan and Husquvarna Saws, the only danger (or the principal danger) from worn shock absorbers that are not replaced is that they will wear a hole in the gas tank. Mr. Pratt's testimony, and that of others, also established that the expected life of an isolator, depending upon the frequency and the extent of the saw's use, was from three months to one year.

7. It was interesting to learn from Mr. Poland and some of the other experienced woodcutters that the expected life span of a chain saw out in the woods was around one year. Apparently, plaintiff's Exhibit No. 6 has outlasted that term.

8. There is one unusual fact in this lawsuit. This same chain saw injured Robert Lee Patterson approximately one week before the plaintiff was injured. Mr. Patterson was a member of Mr. Poland's crew. Mr. Patterson also testified that the cause of the accident was the separation of the handle allowing the saw blade to dip down. However, plaintiff testified that on the day he was injured with the this chain saw, he was cutting on his *third* tree when the accident occurred.

After the accident, what happened to the P–6 Poulan chain saw? The testimony has shown that it was put into a tool shed at the B. C. & S. Wood Company. During his recuperation, Mr. Poland testified that he was urged by the doctor to consider going back to work. He asked his doctor if he could go out with his neighbor, Lee Arthur Davis. After receiving the doctor's approval, he drove a truck for Lee Arthur Davis for one and one-half days. The testimony shows that Lee Arthur Davis expressed a need for another saw, and Mr. Poland mentioned the saw now marked P–6. When they went back into town with a load of wood for the woodyard, Mr. Davis—and I do think that I am quoting him correctly— said to Mr. Poland, "Tell Sam [Pullig] to sell me a saw."

Mr. Pullig's testimony fixed the date of that transaction as March 9, 1978, which is some three-plus months after Mr. Poland's accident. When Mr. Poland brought that same saw (Exhibit P–6) from Mr. Pullig's tool shed, Mr. Davis testified that he "fired it up" and that he ran it for four hours in the field that day with no problems. Later that afternoon, he took it to Mr. Pratt's shop to get some new rubber isolators put in and to get some screws redrilled. The saw was repaired that evening and returned to Mr. Davis before 11:00 O'Clock that night. He took it back to the field the next day and used it continuously. One of the counsel asked Mr. Davis how the saw worked and he answered, "Just perfect!"

Mr. Davis, like Mr. Poland, was a knowledgeable user of chain saws. He testified that he owned seven at one time which he used in his operation, and that four of them were Poulan saws. Mr. Davis testified that the expected frequency of replacing shock absorbers depends on how hard one uses the machine. He had a standard: if a saw was getting full use, in approximately two and one-half to three months he would take it into the shop and have it worked on. He also testified that one could tell by merely picking up a chain saw whether or not it was getting loose and needed new bushings. At one point, Mr. Davis took this same saw

back to Mr. Pratt to be rebuilt because the sprocket was worn out and the saw needed a new muffler. The motor was overhauled, as well, and then the saw was brought back and used in the field.

The testimony shows that Lee Arthur Davis is a next door neighbor and friend of Mr. Poland. He has known Mr. Poland all of his life. The testimony shows that Mr. Poland was instrumental in helping Mr. Davis acquire the saw identified as P–6 from Mr. Pullig.

9. It is this court's conclusion after hearing all of the testimony that there is no defect in the Poulan 4200 chain saw entered here as Exhibit P–6.

The court finds that any chain saw is inherently a dangerous instrument. However, the company used effective engineering design and tests to insure that the saw is functionally as safe as can be reasonably expected. Further, the alleged defect would not affect the control of the chain saw, nor would it cause the handle to separate from the body of the saw. This court is of the opinion that the injury to Mr. Poland was caused when the chain saw kicked back. The kickback is a phenomenon known to every user of a chain saw. Besides the warning in the owner's manual, Beaird-Poulan has several design techniques intended to guard against the kickback, such as the bumper spur, the guard over the bow, and handle space sufficient for adequate control of the chain saw in a kickback situation.

Those are the findings of fact. Now for the conclusions of law:

## I.

■■ This is a diversity case, and this court is bound to apply the law of Louisiana in a products liability case. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Since the lodestar decision in *Weber v. Fidelity & Casualty Insurance Company of New York*, 259 La. 599, 250 So.2d 754 (1971), Louisiana has applied a species of strict liability similar to that contained in the *Restatement (Second) of the Law of Torts*, § 402A. As the Louisiana Supreme Court stated in *Weber*:

A manufacturer of a product which involves a risk of injury to the user is liable to any person, whether the purchaser or a third person, who without fault on his part, sustains an injury caused by a defect in the design, composition, or manufacture of the article, if the injury might reasonably have been anticipated. However, the plaintiff claiming injury has the burden of proving that the product was defective, *i. e.*, unreasonably dangerous to normal use, and that the plaintiff's injuries were caused by reason of the defect.

\* \* \* \* \* \*

If the product is proven defective by reason of its hazard to normal use, the plaintiff need not prove any particular negligence by the maker in its manufacture or processing; for the manufacturer is presumed to know of the vices in the things he makes, whether or not he has actual knowledge of them.

250 So.2d at 755–756. In the Fifth Circuit, the *Weber* case was applied in *Welch v. Outboard Marine*, 481 F.2d 252 (5th Cir. 1973). In the Western District of Louisiana, the *Weber* case was cited as the controlling law in *Soileau v. Nicklos Drilling Company*, 302 F.Supp. 119 (W.D. La. 1969).

The invocation of strict liability brings with it a corresponding change in the analysis conventionally used in a delictual action. "In essence, it is liability without proof of specific substandard conduct." *Dixon v. Gutnecht*, 339 So.2d 1285 (La.App. 1st Cir. 1976).

The plaintiff's burden here is to prove the following elements: first, that Beaird-Poulan's 4200 chain saw was defective; second, that the chain saw was in its normal use; third, that the product was unreasonably dangerous in that use; and fourth, that his injuries were proximately caused by the defect. *Hastings v. Dis tran Products, Incorporated*, 389 F.Supp. 1352 (W.D. La. 1975). *Perez v. Ford Motor Company*, 497 F.2d 82 (5th Cir. 1974); *Perkins v. Volkswagen of America, Inc.*, 596 F.2d 681 (5th Cir. 1979).

In the *Perez* case, the Fifth Circuit stated that:

The plaintiff's burden of proof in a products liability case, as stated by the court in *Weber*, is two-tiered. The plaintiff first must prove that the manufacturer's product was defective. In order to establish defectiveness, the plaintiff must show that the product was in normal use and that the product was unreasonably dangerous in that use. After proving that the product was defective for normal use, the plaintiff must then show that his injuries were caused by the defect.

497 F.2d at 86.

■ In the present case, this court finds that the chain saw involved in this accident was in its normal or "intended" use. This is a professional chain saw which was being used by a professional woodsman to harvest trees. It is obviously a very dangerous instrumentality. However, this court does not find *any* defect in this particular chain saw, introduced into evidence as Exhibit P–6. No defect was proven by *any* evidence, much less a preponderance of the evidence.

In the *Welch* case, the court held that "a product is defective and unreasonably dangerous when a reliable seller would not sell the product if he knew of the risks involved or if the risks are greater than a reasonable buyer would expect." 481 F.2d at 254. *Fincher v. Surrette*, 365 So.2d 860, 862 (La. App. 4th Cir. 1978); *Foster v. Marshall*, 341 So.2d 1354 (La.App. 2d Cir. 1977).

There has been absolutely no testimony or evidence produced that would indicate the chain saw in question was defectively manufactured. To be functional, a chain saw must cut timber. Unfortunately, a blade that will cut wood will also cut a leg, a foot, or a hand. If a gasoline engine, powering a sprocket which drives a multi-tooth flexible chain saw blade at a high rate of speed, can cut down trees and then cut them into cord wood at the rate of 15 cords per day, it is a highly efficient cutting machine. As such, it is of course dangerous—but not defective—as is the butcher knife on the kitchen counter that you or

your wife use every day. That knife is an efficient cutting machine—dangerous but not defective.

The plaintiff, Arnetta Poland, was an experienced chain saw user and aware of the obvious dangers in using a chain saw. He has not proven that any defect existed in this saw which would render it unreasonably dangerous in normal use. Therefore, the plaintiff has failed to carry his burden that any defect in the saw caused his injury.

## II.

■ Plaintiff has also alleged that the Model 4200 power chain saw was defectively designed. In defective design cases, the product is used exactly as it was intended to be used and yet harm still occurred. However, for a design to be defective, it must be so dangerous that a reasonable man would not sell the product if he knew of the risk involved. *Welch v. Outboard Marine, supra.* In Louisiana, the general rule is that a manufacturer owes all reasonably foreseeable users of his products a duty adequately to design and manufacture that product. *Leonard v. Albany Machine & Supply Company*, 339 So.2d 458 (La.App. 1st Cir.), *writ refused*, 341 So.2d 419 (1976); *Bowen v. Western Auto Supply Company*, 273 So.2d 546 (La.App. 1st Cir. 1973); *Gauthier v. Sperry Rand, Inc.*, 252 So.2d 129 (La.App. 3d Cir.) *writ refused*, 253 So.2d 382 (La. 1971).

■ Although the custom in the industry as it existed at the time of the manufacturer is not conclusive, it may be considered when determining the duties owed by the manufacturer of a product. *Leathem v. Moore*, 265 So.2d 270 (La.App. 1st Cir. 1972). Mr. Gililland testified, and that testimony was not diminished by any other witness, that there were no governmental or industry standards at the time the saw in question was manufactured in 1975.

The court tends to agree with the testimony of Mr. Gililland that in operational and safety features, the Model 4200 Poulan chain saw met or exceeded the state of the

art in the international chain saw industry at the time the saw was manufactured. More specifically, the court finds that the six shock absorbers were not defectively designed and were mechanically sound and safely engineered. The plaintiff's defective design contention is meritless.

■ Since this court finds there is no liability on the part of the defendant, Beaird-Poulan, for a defectively designed or manufactured product, the court does not need to reach the manufacturer's defenses. However, the court wishes to note that contributory negligence has no place in a products liability case. This court would have applied the more subjective assumption of the risk analysis. *Hastings v. Distran Products, Inc., supra.*

I have already found and have held that the plaintiff has failed to prove that this accident occurred as a result of a chain saw manufacturing error or a design defect. I have found that the six isolation dampeners could not have caused this accident.

### III.

Finally, in his pretrial order and through the evidence which he has presented at trial, the plaintiff asserts that the defendant has breached its duty to warn of the dangers in a Model 4200 chain saw.

■ The law in Louisiana is that a manufacturer of a potentially dangerous instrumentality such as a chain saw has a duty to instruct reasonably foreseeable users of their product with regard to its safe use. *Williams v. Allied Chemical Corporation,* 270 So.2d 157 (La.App. 1st Cir. 1972), *writs refused,* 271 So.2d 875 (La. 1973). "This duty exists even though the product is not defective. Rather, it is the potential harm which can result through improper use of the product that gives rise to the duty to instruct or warn." *AMCO Underwriters v. American Radiator and Standard Corporation,* 329 So.2d 501, 510 (La.App. 1st Cir. 1976).

The leading Louisiana case imposing a duty upon the manufacturer to warn was cited by both parties. This is the case of *Chappuis v. Sears, Roebuck & Co.,* 358 So.2d 926 (La. 1978). Mr. Smith spent some time during his closing argument comparing the holdings in the *Chappuis* case with the facts in the instant case. It should be noted that in the *Chappuis* case the worker was injured when the face of his hammer chipped while in normal use. The hammer had been previously chipped, and evidence in that case proved that a chipped hammer is likely to chip again. The court held that since Chappuis did not know of the possible danger arising from a chipped hammer, but the manufacturer *did* know of the danger or potential danger, the manufacturer had a duty to warn consumers that chipped hammers should be discarded or returned to the manufacturer because of the danger. Failure to warn constituted "fault" under La. Civ.Code art. 2315.

Thus, the holding in *Chappuis* is clearly based on a finding that the manufacturer knew of the danger but that the injured person did not. The court explained, "If Chappuis knew, or should have known of the danger, and chose, nevertheless, to use the dangerous instrument, he would have shared the fault of the manufacturer, and could not recover." 358 So.2d at 930. The language "should have known" in this quotation reflects the earlier jurisprudence which held that there is no duty to warn of known or obvious dangers, or to warn knowledgeable purchasers or users of dangers of which they are or should be aware. *Foster v. Marshall, supra; Bradco Oil & Gas Co. v. Youngstown Sheet & Tube Co.,* 532 F.2d 501 (5th Cir. 1976); *West v. Hydro-Test, Inc.,* 196 So.2d 598 (La.App. 1st Cir. 1967). The jurisprudence as reflected in these cases recognized two distinct situations in which a duty to warn is unnecessary.

In the first situation, as in the *Foster* case, a warning is unnecessary where a reasonable man would, in the course of human experience, know of the danger anyway because it is obvious. In *Foster,* the decedent was killed when a worn cotter key broke allowing the defendant's trailer to swing into the decedent's lane of traffic.

Plaintiffs argued that the manufacturer was strictly liable for building a defective bolting assembly or for failure to warn users that the cotter key should be replaced periodically. After finding that the assembly was not defective, the court addressed the failure to warn issue, noting that "a reasonable buyer . . . should expect the product to contain consumable parts which require inspection and maintenance." 341 So.2d at 1361. Finding that "persons ordinarily dealing with agricultural equipment, whether dealers or users, are or should be aware that cotter keys need inspecting and replacing periodically", the court concluded that it is obvious that danger may result when equipment is not properly maintained. *Id.* The same reasoning applies to a chain saw's rubber bushings. Thus, under the reasoning employed in that case, no warnings are required to be given an experienced user such as Arnetta Poland.

▮ The *Foster* case is a solid case about the duty to warn, and has been followed in several recent cases. One is *Tri-State Insurance Co. v. Fidelity & Casualty Insurance Co.,* 364 So.2d 657 (La.App. 2d Cir. 1978). In that case, a split-rim wheel of a truck exploded while the plaintiff was inflating a tire mounted on the wheel. The court found that the practice of people who deal with split-rim wheels is to use a cage or chains while inflating a tire on a split-rim because of the common knowledge that explosions are possible and that safeguards are necessary to avoid the danger of injury. Noting that "the wheel was old and had been subjected to hard use" and was not recently manufactured or rebuilt, the court found no defect and found no duty to warn, citing *Foster* for the proposition that "there is no duty on the part of the manufacturer to make a product that will last forever or will withstand abuse or lack of maintenance." 364 So.2d at 660. As the court stated in *Foster*:

> A manufacturer cannot be expected to design products with component parts which will never wear out, regardless of the nature of use or maintenance. A

manufacturer is entitled to anticipate that a consumer using its product will use reasonable care in maintaining it.

341 So.2d at 1361.

In the later case of *Insurance Company of North America v. Atlas Construction Co., Inc.,* 368 So.2d 1247 (La.App. 4th Cir. 1979), several employees were injured when a winch that had been constructed and mounted on the back of a truck malfunctioned. The winch had been built in 1973 and had performed without any problems for almost three years after it had been mounted on the truck by the owner. The court found it "unlikely" that the problem with the winch existed from the outset, and applied *Foster* for the principle that "a manufacturer cannot be expected to design products whose parts do not wear out." 368 So.2d at 1249.

▮ Thus, the Louisiana jurisprudence is clear that warnings are unnecessary where the dangers involved are obvious to the user. Further, the courts will find such dangers to be obvious where a product has not been adequately inspected or maintained, since a user, and particularly a user with the skill of Arnetta Poland, can be presumed to know that adverse consequences can ensue from the failure to properly maintain a product.

The second situation in which a warning is unnecessary, as in the *Bradco* and *West* cases, is where the purchaser or the user has certain knowledge or sophistication, professionally or otherwise, in regard to the product. The buyer or user is or should be aware of the dangers associated with the use of the particular product. For example, a seaman working in the boiler room of a vessel need not be warned of the dangers associated with the boiler which are within the realm of his experience and expertise, though a layman may be unaware of such dangers. Whether a buyer or user in a given case falls within this so-called "sophisticated purchaser doctrine" is a question of fact. *Fincher v. Surrette,* 365 So.2d 860, 863 (La.App. 4th Cir. 1978).

So what are the facts? The facts are that Mr. Arnettta Poland was 41 years old when his injury occurred. He testified that he quit school in the fifth grade, when he was 10 years old. He then went into the woods to work harvesting trees. At that age, other boys in other places were playing with marbles or riding their bikes, but Arnetta Poland was on the small end of a two-man McCullough chain saw in tandem with his larger, older cousin harvesting trees. For at least 30 years, as man and boy, his work has been in the woods and around chain saws.

He testified that his injury on November 24, 1977 was his first in 31 years, except for the scratch or cut which he said one could get from sharpening a saw. His first injury was a serious one, but it is not chargeable to Beaird-Poulan as designer and manufacturer of the Model 4200 chain saw.

The decision in this matter on all counts is in favor of the defendant. Counsel for the defendant are requested to prepare a formal judgment to be submitted within five working days.