341 So.2d 1354 (1977)
Reverend Aubrey Denson FOSTER, Individually and as Tutor of his minor son, Robin D. Foster, et al.
v.
Billy R. MARSHALL et al.
No. 13058.
Court of Appeal of Louisiana, Second Circuit.
January 10, 1977.
Rehearing Denied February 14, 1977.
Writ Refused March 31, 1977.
*1356 Kierr, Gainsburgh, Benjamin, Fallon & Lewis by Harvey J. Lewis, New Orleans, for appellants.
Theus, Grisham, Davis & Leigh by J. Michael Hart, Monroe, for Billy R. Marshall and American Employers Ins. Co.
Davenport, Files, Kelly & Marsh by Thomas W. Davenport, Jr., and William G. Kelly, Jr., Monroe, for Scott Truck and Tractor Co. of Winnsboro, Inc. and Scott Truck and Tractor Co. of Monroe, Inc.
Gist, Methvin & Trimble by James T. Trimble, Jr., Alexandria, for Prior Products, Inc. and Southwest Wheel & Manufacturing Co., Inc.
Before BOLIN, HALL and JONES, JJ.
En Banc. Rehearing Denied February 14, 1977.
HALL, Judge.
This wrongful death action arises from fatal injuries suffered by Mrs. Eula Mae Foster when an oncoming cotton wagon or trailer being towed by a pickup truck veered into decedent's lane of travel and collided with her automobile. The cause of the trailer veering into decedent's lane of travel was the failure of the bolting assembly connecting the towing yoke to the trailer.
The plaintiffs are Reverend Aubrey Denson Foster, decedent's husband, individually and as tutor of a minor son, and two major sons. The defendants are (1) Billy Ray Marshall, owner of the cotton trailer and driver of the pickup truck; (2) American Employers Insurance Company, liability insurer of Marshall; (3) Prior Products, Inc. and Southwest Wheel & Manufacturing Company, Inc., manufacturer of the cotton trailer[1] and (4) Scott Truck and Tractor Company of Winnsboro, Inc., which sold the used and refurbished trailer to Marshall.[2]
Plaintiffs' suit is based on contentions that decedent's death was caused by the concurring fault of all defendants and in particular that:
(1) Prior is liable:
(a) For manufacturing a product that was defectively designed; and
(b) For failing to give any warnings or instructions concerning proper maintenance which it knew was mandatory for safe use of its product.
(2) Scott is liable:
(a) For inadequately inspecting the wagon and failing to replace unsafe and/or missing parts; and
(b) For failing to make the vehicle reasonably safe for highway use; and
(3) Marshall is liable for failing to correct unsafe conditions in the cotton wagon prior to putting it to use on public streets.
After trial on the merits, the district court in a lengthy, carefully considered, written opinion, found that only Marshall was liable for Mrs. Foster's death. Judgment was rendered in favor of plaintiffs *1357 against Marshall in the total amount of $51,318.20, subject to a credit of $5,000 paid by Marshall's liability insurer prior to trial, being the full amount of the liability policy limits. The amount of the award to plaintiffs was mitigated by reason of Marshall's impecunious financial condition. Judgment was also rendered rejecting plaintiffs' demands against Prior and Scott.
Plaintiffs appealed from the judgment insofar as it exonerated Prior and Scott and insofar as it awarded inadequate damages. Marshall and his insurer answered the appeal urging the judgment was in error in finding these defendants liable to plaintiffs, in failing to find liability on the part of Prior and Scott, and in awarding excessive damages.
For reasons expressed in this opinion, we affirm the judgment of the district court rejecting plaintiffs' demands against Prior; reverse the judgment rejecting plaintiffs' demands against Scott; affirm the judgment holding Marshall liable; and award damages in the total amount of $93,818.20 against Scott and Marshall in solido.
Mrs. Foster was driving to work about 9:25 a.m. on the morning of October 26, 1972, traveling in a southerly direction along Main Street (Louisiana Highway 605) within the Town of Newellton, Tensas Parish, Louisiana. At the same time Billy R. Marshall, a contract cotton harvester, was driving his 1965 GMC truck towing a cotton wagon in a northerly direction along Main Street. As these vehicles approached each other, the bolting assembly connecting the towing yoke to the front axle of the cotton wagon failed, causing the wagon to swerve into Mrs. Foster's lane of travel and to collide with her automobile. The resulting impact demolished the Foster vehicle and fatally injured Mrs. Foster.
The cotton wagon consisted of the body or superstructure mounted on a trailer or "running gear." The running gear was manufactured by Prior in the early 1960's and consisted of the wheels, yoke or tongue, front and rear axles, reach pole and bolting assembly. The trial court accurately described the essential towing components and how they were connected as follows:
"The trailer lacked motive power and had to be connected to some other vehicle by means of a `y' shaped yoke or tongue so that it could be towed. The lower, single end of this yoke or tongue connected to the towing vehicle and each of its two upper ends fit into two semi-circular or `U' shaped steel brackets called clevis mounts that were welded onto the trailer's front axle.
"The `bolting assembly' which Prior designed to connect the towing yoke to the trailer's axle was very simple. It consisted of three components: an unthreaded bolt with a hole near one end, called a `clevis pin,' a flat washer and a 1/8th inch cotter key that was fit in the pin hole. The metal clevis mounts and each end of the yoke had holes drilled in them in order to accommodate the `clevis pin.'
"The two arms of the towing yoke were connected to the trailer axle by positioning the ends thereof between the arms or side plates of the clevis mounts, with all of the holes in line and the clevis pins threaded through the holes.
"The clevis pins were made fast by placing the washers over the small ends thereof and inserting the cotter keys in the holes in the pins, behind the washer. Of course, to make the cotter keys effective, the double ends thereof were spread and bent apart."
Prior to the collision the bolting assembly on the left front axle separated, causing the wagon to veer to its left, invade the opposing line of traffic, and collided with the left side of the car driven by Mrs. Foster. The bolting assembly separated because the cotter key failed, allowing the clevis pin to work its way out of the clevis mounts which in turn allowed the arm of the towing yoke to separate from the trailer axle. Investigating officers found the clevis pin on the street forward of the point of impact, this being in the direction that the pickup truck and trailer were proceeding. The clevis pin and the remnants of the cotter key contained within the diameter of the pin were *1358 subsequently examined by the parties expert witnesses and were introduced as an exhibit during the trial of this case. No washer was found at the accident scene. The cotter key in place at the time of the failure was a 3/32 inch cotter key rather than a 1/8 inch cotter key originally furnished by the manufacturer. No washer was in place on the bolting assembly connecting the other arm of the towing yoke to the front axle.
The running gear of this particular trailer and several thousand others like it were manufactured by Prior in the early 1960's. Three or four thousand of the trailers, including the one involved in this accident, were sold by Prior to Kline Trailer Company, a distributor in Lubbock, Texas. Kline received the units unassembled, assembled the running gear, and put on bodies or framework of its choice.
Seven of the wagons were purchased from Kline by Herman Harris between the years 1960 and 1963. Harris was a contract cotton harvester who lived in northeast Louisiana and worked both in Louisiana and Texas. Harris used the trailers in his business from 1960 through 1970. He would transport his trailers between Louisiana and Texas in a "piggyback" manner by disassembling two of the trailers and stacking them on a third trailer that was then towed by a pickup truck or automobile over the highways. On the occasion of each reassembly, Harris would change the cotter keys. Sometimes the washers were put back in place and sometimes they were not.
Harris, a customer of Scott, mortgaged four of the trailers to Scott as collateral security for his account with that company. Financial difficulties resulted in the four mortgaged trailers being judicially seized, delivered to Scott for storage and ultimately sold to Scott at sheriff's sale in mid-1972.
For the most part, from the completion of the cotton harvest in Louisiana in 1970 to the time the trailers were seized in mid-1972, they stood idle in Harris' pasture. During that time two of the trailers were used on occasion by friends and neighbors of Harris to haul hay and other crops.
After Scott obtained title to the four trailers by virtue of the sheriff's sale, they were inspected by Willie Carter, an employee of Scott with many years experience in dealing with cotton trailers and other agricultural equipment. Scott is a relatively large dealer in agricultural equipment and sells new trailers which it buys from manufacturers. Scott has a staff of mechanics trained to work on agricultural equipment. The company does not ordinarily deal in used trailers.
Carter's inspection of the trailers revealed that the superstructures were in bad condition, that the tongue on one of the wagons required welding, and that tires needed replacing. Scott's personnel demolished the superstructures. Scott contracted with the Arnold brothers, d/b/a Quality Builders, to build new bodies and Arnold also did the required welding work on the tongue of one of the wagons, which was not one of the trailers ultimately sold to Marshall.
Carter testified he visually inspected the cotter keys from about three feet away and they looked to be in satisfactory condition. He testified he also checked the lugs on the wheels to see "if the lugs had been run loose and wobbled out." He also looked at the coupling poles to see if they were bent and "generally checked `em over." Arnold testified that he also visually inspected the cotter keys and they looked all right. Arnold further testified that Carter asked him to check the trailers and if they needed any repairs to go ahead and make the repairs.
After the new metal beds and baskets were built and painted, the trailers were returned to Scott which on September 19, 1972, sold three of the trailers to defendant, Billy Ray Marshall, a contract cotton harvester in the northeast Louisiana area. Marshall put the trailers to immediate and continuous use until the occurrence of the accident, about five weeks later. Marshall testified the trailers performed well and that about three days prior to the accident he visually inspected the cotter keys and they looked all right, but he could not be sure if he looked at the cotter keys on all *1359 three trailers and he was not sure whether the washers were in place.
It was established by the testimony of employees of Prior and Kline, over the objection of plaintiffs, that out of the many thousands of trailers sold with identical bolting assemblies over a period of several years, and after use of the wagons for several years, there have never been any complaints received concerning failure of the bolting assemblies, other than the accident involved in this case. The history of the several trailers owned by Harris and then by Marshall was well-established at the trial with no incidents relating to the bolting assembly prior to the accident in question.
Several well-qualified expert witnesses testified for the parties. As noted by the trial judge, each of the witnesses was loyal to the party who hired him.
Testifying for plaintiff was Dr. Gerald D. Whitehouse, professor in mechanical engineering at LSU since 1966, teaching mainly in the area of design. Dr. Whitehouse testified there is no way to predict the useful life of a cotter key. If left outside in the elements it will rust and deteriorate. The use of a washer may or may not reduce the wear on the cotter key. On occasion there will be loads imposed on the cotter key, such as in trips over rough terrain.
Dr. Whitehouse was of the opinion the design of the bolting assembly was inadequate because the integrity of the design depended on a consumable item, the cotter key, the condition of which involves a qualitative evaluation by a person in the field and for which there is no backup safety device in the event of failure. The design is weakened by use of a smaller key obviously too small for the hole in the clevis pin.
The witness was of the opinion the cotter key in this case was weakened by a series of impacts over a period of time and finally failed due to a force sufficient to finish breaking the key. The witness was of the opinion that at the time of the sale of the wagon to Marshall it could have been detected that the key was in poor condition and too small and that it should have been changed at that time.
Testifying for Scott was Dr. Mehdy Sabbaghian, also a professor in mechanical engineering at LSU since 1964. Dr. Sabbaghian was of the opinion there would never be any axial force placed on the cotter key and that the design was such that it would not cause pressure or wear on the key. He was of the opinion the key failed because of some impact force, (such as hitting a log), applied against and which sheared the key. It would take 150 to 200 pounds of force in order to shear a 3/32 inch key. The washer is of no importance. The witness was of the opinion the photographs in evidence showed no sign of wear on the cotter key involved in this accident. He was of the opinion the design was unreasonably dangerous because of the possibility of hitting a log or some other object with sufficient force to shear the cotter key.
Prior offered three expert witnesses. Professor Charles E. Balleisin, professor in mechanical engineering at SMU since 1957, testified that the bolting assembly design is simple, easily inspected, and easily maintained. The load is transverse to the clevis pin and not on the cotter key. Dr. Balleisin stated that a 3/32 inch cotter key has only 1/2 of the shear strength of a 1/8 inch key. Cotter keys are in wide use for similar purposes on integral parts of motor vehicles, such as parts of the accelerator and brake linkage of automobiles.
Also testifying for Prior was Edward Earl Walters, consulting civil engineer with Haag Engineering Company in Dallas, who taught engineering at SMU for 22 years. Mr. Walters testified the cotter key in this case was deteriorated, rusty and worn. It had deteriorated due to abrasion, rubbing and frictional wear until the ends had worn through. It had been in use for a long period of time. Mr. Walters was of the opinion the key did not suddenly shear but that it was a long, wearing process. He was further of the opinion that the cotter key was in an unacceptable condition at the time of the sale four or five weeks prior to the accident and that the condition of the *1360 key would have been apparent to anyone inspecting it. The witness thought a washer might reduce wear on the key but would not make it stronger because there is no load transfer between the washer and other components.
Another expert witness for Prior was Professor Joseph H. Barnwell, professor in mechanical engineering at Louisiana Tech since 1958, with considerable practical experience and experience with agricultural equipment specifically. Professor Barnwell testified that over an extended period of time the 3/32 inch cotter key, which was too small to begin with, wore thin because of a combination of wear and a small amount of play between the outer face of the clevis mount and the cotter key. It finally broke off. The professor also verified that a 3/32 inch key has only 1/2 the shear strength of a Vi inch key.
Professor Barnwell was of the opinion the design was adequate so long as proper parts were used. There is no basic force applied to the cotter key which simply holds the clevis pin in place. There is some very slight amount of play in maneuvers such as going around a curve. Professor Barnwell was of the opinion the cause of the failure of the key was a combination of it being too small and lack of maintenance over many months or even years. He was of the opinion the cotter key should have been replaced before resale of the cotton trailer.
Based on a preponderance of the totality of the evidence, including physical evidence, lay testimony and expert testimony, this court concludes:
(1) The cotter key failed primarily because of deterioration and wear over an extended period of timeat least two years. Some shear force, either slight repeated occasional impacts or an impact sufficient to ultimately shear the deteriorated and worn cotter key, may have contributed to the failure, but was not a major or primary cause;
(2) The cotter key was in poor condition, worn and deteriorated, at the time of the sale of wagon by Scott to Marshall approximately five weeks prior to the accident;
(3) The use of the smaller 3/32 inch cotter key rather than a 1/8 inch cotter key was a contributing factor to the failure;
(4) The poor condition of the cotter key and the fact that it was too small for the hole in the clevis pin was discoverable by a careful, close inspection during the time the trailer was in the possession of Scott, Arnold, and Marshall; and
(5) A washer probably was not used on the bolting assembly from the time the cotter pin was last replaced by Harris until the accident. The absence of the washer was a contributory, but relatively insignificant factor in the wearing and ultimate failure of the cotter key.
Prior's Liability
Plaintiffs argue that Prior is liable for manufacturing a product that was defectively designed and for failing to give warnings or instructions concerning proper maintenance which it knew was mandatory for safe use of its product.
The principles governing a manufacturer's liability for damages caused by a defective product are set forth in Weber v. Fidelity & Casualty Insurance Company of New York, 259 La. 599, 250 So.2d 754 (1971):
"A manufacturer of a product which involves a risk of injury to the user is liable to any person, whether the purchaser or a third person, who without fault on his part, sustains an injury caused by a defect in the design, composition, or manufacture of the article, if the injury might reasonably have been anticipated. However, the plaintiff claiming injury has the burden of proving that the product was defective, i.e., unreasonably dangerous to normal use, and that the plaintiff's injuries were caused by reason of the defect.
* * * * * * "If the product is proven defective by reason of its hazard to normal use, the plaintiff need not prove any particular negligence by the maker in its manufacture or processing; for the manufacturer *1361 is presumed to know of the vices in the things he makes, whether or not he has actual knowledge of them."
As designed and manufactured by Prior, the bolting assembly of the cotton wagon was not unreasonably dangerous to normal use. The cotter key, within the framework of the design, was essentially not a loadbearing component but was basically a positioning device. With a 1/8 inch cotter key, which was the size furnished by the manufacturer and the size the hole in the clevis pin was designed to accommodate, in place, a shear force of about 400 to 500 pounds would have been necessary to break the key. Even with the smaller 3/32 inch cotter key in place, a shear force of about 200 pounds would be necessary to shear the key. Exertion of this sort of impact force against the key is improbable and we have found as a fact that in this case failure of the cotter key was not due to any such shear force. The evidence does not establish that a properly sized cotter key could be anticipated to wear out under normal use for a reasonable period of time.
A manufacturer cannot be expected to design products with component parts which will never wear out, regardless of the nature of use or maintenance. A manufacturer is entitled to anticipate that a consumer purchasing its product will use reasonable care in maintaining it. The product in this case was a relatively simple piece of agricultural equipment for use by farmers or harvesters who generally have some degree of experience in the maintenance of agricultural equipment. All persons who dealt with this particular wagon testified they knew that cotter keys will wear out and need to be replaced periodically. They further testified they knew the proper size cotter key to use is the largest size that will fit the hole. The cotter key failed in this case, not because the bolting assembly was defectively designed, but because the cotter key in use was undersized and had not been reasonably inspected and maintained.
Strongly supporting the adequacy of the design is the fact that the bolting assembly on the wagon involved in this accident had functioned properly and without difficulty for seven to nine years. There had been no other known failures of Prior bolting assemblies on the many thousands of units manufactured and sold by that company. In cases where defective design is alleged, as distinguished from cases in which defective manufacture is alleged, all of the products are designed alike and the history of accidents is relevant and has probative value in showing whether the design in question is unreasonably dangerous.
Plaintiffs argue that the design should have included a backup safety component such as a threaded bolt and nut. The evidence does not establish that the use of such additional safety components was a standard in the industry or that the failure to use such additional components made the design in question unreasonably dangerous.
Two Louisiana cases in which a manufacturer was held free from liability for damages caused by the failure of a component of a mechanical device where the failure was found to have been due to improper maintenance are Simon v. Ford Motor Company, 282 So.2d 126 (La.1973) and Meche v. Farmers Drier & Storage Company, 193 So.2d 807 (La.App. 3d Cir. 1967).
A product is defective when the risks are greater than a reasonable buyer would expect. Welch v. Outboard Marine Corp., 481 F.2d 252 (5th Cir. 1973). A reasonable buyer of a piece of agricultural equipment such as a cotton wagon should expect the product to contain consumable parts which require inspection and maintenance.
Plaintiffs also argue that Prior failed to warn of the dangers which would accompany improper maintenance and the use of an improper sized cotter key, relying heavily on Rey v. Cuccia, 298 So.2d 840 (La.1974). Rey held:
"If the trailer were so constructed that such a slight deviation from a recommended procedure of installation of the hitch (24 inches above the ground rather than 18) would cause this type of damage, then this constitutes a defect for which *1362 the manufacturer would be responsible, absent at least some warning of the danger involved."
Amco Underwriters of Audubon Insurance Company v. American Radiator and Standard Corporation, 329 So.2d 501 (La. App. 3d Cir. 1976) holds that the duty to warn "exists even though the product is not defective. Rather, it is the potential harm which can result through improper use of the product that gives rise to the duty to instruct or warn."
However, the duty to warn goes only to those dangers which are not obvious. A manufacturer is not compelled to warn knowledgeable purchasers of the dangers of which the buyer either knows or should be aware. Bradco Oil & Gas Company v. Youngstown Sheet & Tube Co., 532 F.2d 501 (5th Cir. 1976); West v. Hydro-Test, Inc., 196 So.2d 598 (La.App. 1st Cir. 1967).
In this case it is firmly established that persons ordinarily dealing with agricultural equipment, whether dealers or users, are or should be well aware that cotter keys need inspecting and replacing periodically. The two users of the particular cotton wagon in question, Harris and Marshall, each testified he was aware that cotter keys had to be checked, as did Scott's employee, Carter. The bolting assembly was readily visible and accessible, and the cotter key could be inspected and replaced easily and inexpensively.
Furthermore, it is difficult to imagine a warning that would, as a practical matter, be likely to reach a third party purchaser some seven to ten years after the product was manufactured. Even a stamp or label on the product itself would likely be ineffective after the passage of that much time, particularly considering the exposure of the product to the elements.
The product was not unreasonably dangerous as manufactured. The need for proper maintenance and use of a proper size cotter key was obvious and did not require warnings by the manufacturer. Prior is not liable.
Scott's Liability
Plaintiffs urge that Scott is liable for inadequately inspecting the wagon and in failing to replace unsafe and/or missing parts. In holding Scott free from liability, the trial court found that the inspection by Carter and the Arnold brothers substantially complied with the duties imposed on the seller to inspect in a reasonable and prudent manner and found that the evidence was insufficient to prove that parts of the bolting assembly were missing or patently faulty at the time of the sale.
The opinion of this court is that the district court's first conclusion is erroneous as a matter of law and its second conclusion is erroneous as a matter of fact. The duty of a dealer in used vehicles who undertakes to recondition a vehicle is stated in Barker v. Phoenix Insurance Company, 220 So.2d 720 (La.App. 2d Cir. 1969):
"While a dealer in used or second-hand motor vehicles who undertakes to recondition a vehicle for resale is not an insurer of the safety thereof, he is nevertheless under a duty to use reasonable care in making tests for defects which would render the vehicle a menace to persons using or coming into contact with it and making it reasonably safe for use on the highways. He is charged with the knowledge of patent defects or defects which are discoverable in the exercise of ordinary care."
In Barker, a used car dealer was found liable where it failed to inspect and discover damage to the sector shaft of the steering assembly of a wrecked automobile which it undertook to repair for resale.
In the instant case, Scott, a relatively large dealer in agricultural equipment with experienced personnel, undertook to refurbish and recondition the used cotton wagon for resale. Scott's experienced employee, Carter, and the Arnold brothers with whom Scott contracted to do work on the trailer, made a generally thorough visual inspection of the trailer. Scott's employees dismantled the superstructure and the Arnold brothers built a new superstructure. Each *1363 visually looked at the cotter keys on the bolting assemblies from a distance and each testified they looked all right. The wagon was sold, along with two others, to Marshall as being, either impliedly or expressly, in good condition and fit for its intended use.
The refurbishing of the trailer was extensive and Scott purported to inspect the integral parts of the wagon.
In a previous section of this opinion we have stated our conclusion that the cotter key was in poor condition, worn and deteriorated at the time of the sale and that the condition of the cotter key and the fact that it was too small were discoverable by a careful, close inspection during the time the trailer was in the possession of Scott. This conclusion is contrary to that of the district court, but is supported by a preponderance of the evidence as previously discussed in this opinion.
Scott's employee, Carter, and the Arnold brothers recognized the necessity for checking the cotter key. The cotter key, hidden for the most part by the pin in which it is inserted, could not be adequately inspected by simply looking at it from a distance. The inspection which Scott made, recognizing its necessity, was not adequate and was not made with due care. At the least, the key should have been examined closely, if not removed and replaced. In view of Scott's knowledge of the prior history of the trailer, which was several years old, including its previous storage in a pasture for a considerable period of time, Scott should have removed and replaced the old, rusted and undersized cotter key, an integral part of the bolting assembly, as a matter of routine maintenance and refurbishing prior to resale.
Scott failed to make an adequate inspection and failed to replace the old and undersized cotter key as a matter of routine and required maintenance and thereby breached its duty to use reasonable care in making the vehicle reasonably safe for use on the highways and to discover a patent defect which was discoverable in the exercise of ordinary care.
Plaintiffs also contend that Scott's refurbishing of the cotton wagon makes Scott a manufacturer and subject to a manufacturer's strict liability, comparing Scott to the pulpwood truck outfitter held to be a manufacturer in Spillers v. Montgomery Ward & Co., Inc., 294 So.2d 803 (La.1974). Scott argues that its position is similar to the retail truck dealer in Spillers which was held to be a retailer, not a manufacturer. It is unnecessary for this court to resolve this issue since it has been concluded that Scott is liable under the lesser standard of ordinary care imposed on a retailer which undertakes to refurbish a vehicle for resale.
Insofar as the responsibility of a retailer is concerned, the Spillers case holding the retailer free from liability is distinguishable from the instant case. In Spillers, the defective part was furnished by a reputable manufacturer and the defect was not one discoverable by the usual retailer relying on the work of a manufacturer. In the instant case, the retailer, Scott, itself experienced in the mechanics of agricultural equipment including cotton wagons, had more expertise than did the retailer in Spillers, the defect was more easily discoverable and remedied, and the defect was not in a part of the vehicle furnished by a recent third party manufacturer.
Scott's contention that the failure of the cotter key was caused by a sudden shear force after the sale of the trailer to Marshall and that the cotter key was in good condition when it left Scott's hands has been answered negatively by the findings of fact to the contrary in an earlier portion of this opinion.
The conclusion of this court is that Scott sold a cotton wagon with a defective cotter key in the bolting assembly, which defect was discoverable and easily remedied by a close, careful inspection which was required of Scott under the circumstances of this case, and that the failure of Scott to replace the worn, deteriorated, and undersized cotter key was a legal cause of the accident and plaintiffs' resulting damages, for which Scott is liable.
*1364 Marshall's Liability
Plaintiffs contend Marshall is liable for failing to correct unsafe conditions in the cotton wagon prior to putting it to use on public streets. The trial court applied the presumption of Marshall's negligence arising from the fact that his vehicle collided with the Foster vehicle while in its wrong lane and held Marshall failed to carry his burden of proving he was without slightest fault.
In Simon v. Ford Motor Company, 282 So.2d 126 (La.1973), the court applied the rule that a motorist whose vehicle strays into the wrong lane must exculpate himself from "any fault, however slight, contributing to the accident." Simon involved an accident caused by a failure in the ball joint assembly of an automobile. Under the facts of that case the court concluded that the owner-driver of the vehicle failed to prove he properly maintained the ball joint assembly and, therefore, had not carried the heavy burden of exculpating himself from any fault contributing to the accident. The court further took into consideration the rule, also applicable to the instant case, that one whose vehicle causes injury to another because of an allegedly latent defect has a heavy burden of exonerating himself from fault. See Ryan v. Rawls, 260 So.2d 137 (La.App. 2d Cir. 1972).
Marshall had many years experience in the mechanized harvesting of cotton and extensive use of cotton trailers. He knew or should have known that periodic inspections of the trailers were necessary. His daily routine of connecting and disconnecting the tongue of the trailer to his pickup truck furnished ample and repeated opportunity for him to detect the undersized and worn cotter key. Marshall testified he did, in fact, look at the cotter keys on at least two of the trailers a few days prior to the accident. As in the case of Scott, his inspection was inadequate, if he actually inspected the trailer which was involved in the accident. Marshall failed to exculpate himself from the presumption of negligence and the judgment of the district court holding him liable is correct.
Quantum
In fixing the amount of damages the district court took into consideration the virtually insolvent financial condition of the defendant, Marshall, employed as a painter at the time of trial. The surviving husband was awarded general damages of $15,000, plus $1,318.20 for funeral expenses or a total of $16,318.20. Damages of $15,000 were awarded on behalf of the minor son and damages of $10,000 were awarded to each of the two major sons. The total award was $51,318.20.
Since Scott Truck and Tractor is being held liable in solido with Marshall for plaintiffs' damages, the amounts of the awards must be reassessed by this court.
The decedent was 47 years old at the time of her death. She was survived by her husband, Reverend Foster, to whom she had been married since 1944. She was also survived by one minor son, Robin D. Foster, age 14 and by two major sons, Larry Wayne Foster, age 25 and Danny Ray Foster, age 19. Both of the older sons lived away from home in other cities but visited back and forth with their mother regularly. Reverend Foster was principal of Water-proof High School and an ordained minister. The Foster family was an extremely close and happy one. The trial judge described the decedent as a "lovely, attractive, and efficient lady, who was a devoted mother, a superb wife, and a treasured employee."
At the time of her death Mrs. Foster was employed by Burnsides Antique Store in the Newellton area earning $65 per week. She went to work about four years previously because the family needed additional income. She was in good health and planned to continue working as long as the family needed the additional money.
Shipman v. Tardo, 304 So.2d 381 (La.App. 4th Cir. 1974) held that if a husband has an actual loss as a result of the lost earnings of his wife, he is entitled under LSA-C.C. Art. 2315 to repair of that damage. The Fourth Circuit expressed disagreement with Parker v. Smith, 147 So.2d 407 (La.App. 2d Cir. *1365 1963) which held that a husband has no such claim.
Mrs. Foster, through her earnings which were pooled with those of Reverend Foster to meet the family expenses, was making a material financial contribution to the support of the family and her death has caused an actual financial loss. Under LSA-C.C. Art. 119, the husband and wife owe to each other mutual fidelity, support and assistance and under LSA-C.C. Art. 227, both parents owe an obligation of support to their minor children. There is no legal reason for distinguishing between the loss of support recoverable by the surviving husband and minor children of a wife and mother who is providing support and recovery by a surviving wife and minor children for loss of support by reason of death of a husband and father who is providing support. To the extent that Parker v. Smith, supra, is contrary to the views expressed in the Shipman case and in this opinion, the Parker case is overruled. Reverend Foster and the minor son are entitled to an award for loss of support.
Several cases are cited by plaintiffs and defendants reflecting a wide range in awards to surviving spouses and children. See Aymond v. State Department of Highways, 333 So.2d 383 (La.App. 3d Cir. 1976); Stanley v. Wiley, 325 So.2d 660 (La.App. 3d Cir. 1975); Gunter v. Wiley, 325 So.2d 654 (La.App. 3d Cir. 1975); Wilson v. Pittman, 307 So.2d 804 (La.App. 1st Cir. 1975); Cacibauda v. Gaiennie, 305 So.2d 572 (La.App. 4th Cir. 1974); Rodriquez v. Trebitz, 304 So.2d 396 (La.App. 1st Cir. 1974); Shipman v. Tardo, supra; Smith v. Manchester Insurance & Indemnity Company, 299 So.2d 517 (La.App. 4th Cir. 1974); Barnett v. Trinity Universal Insurance Company, 286 So.2d 770 (La.App. 2d Cir. 1973); LeBlanc v. Estate of Blanchard, 266 So.2d 918 (La. App. 4th Cir. 1972); Womack v. Travelers Ins. Co., 258 So.2d 562 (La.App. 1st Cir. 1972); Winzer v. Lewis, 251 So.2d 650 (La. App. 2d Cir. 1971); Harkins v. State Department of Highways, 247 So.2d 644 (La. App. 3d Cir. 1971).
The awards to plaintiffs are fixed as follows:

Reverend Aubrey Denson Foster:
Loss of love, affection and
 companionship and loss of
 support; $ 45,000.00
Funeral expense; 1,318.20
 ___________
 Total ..... $ 46,318.20
Reverend Aubrey Denson Foster
as Tutor of his minor son,
Robin D. Foster:
Loss of love, affection and
loss of support; $ 22,500.00
Larry Wayne Foster:
Loss of love and affection; $ 12,500.00
 Danny Ray Foster:
Loss of love and affection; $ 12,500.00
 ___________
 Total .... $ 93,818.20

Decree
For the reasons assigned, the judgment of the district court is affirmed insofar as it rejects plaintiffs' demands against Prior, is reversed insofar as it rejects plaintiffs' demands against Scott, is affirmed insofar as it holds Marshall liable, is amended as to the amount of damages to which plaintiffs are entitled, and is recast as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment in favor of plaintiffs, Reverend Aubrey Denson Foster, Individually and on behalf of his minor son Robin D. Foster, Larry Wayne Foster and Danny Ray Foster, against defendants Billy Ray Marshall and Scott Truck and Tractor Company of Winnsboro, Inc., in solido, in the following amounts: Reverend Aubrey Denson Foster$46,318.20; Reverend Aubrey Denson Foster as Tutor of his minor son Robin D. Foster$22,500; Larry Wayne Foster$12,500; and Danny Ray Foster$12,500; with legal interest on said amounts from date of judicial demand, October 12, 1973, until paid, together with all costs of these proceedings, including the cost of appeal, subject, however, to a credit of $5,000 previously paid by American Employers Insurance Company.
*1366 IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of defendants, Prior Products, Inc., Southwest Wheel & Manufacturing Co., Inc. and Scott Truck and Tractor Company of Monroe, Inc., against the aforenamed plaintiffs, rejecting plaintiffs' demands and dismissing their suit against said defendants.
Affirmed in part, reversed in part, amended and recast.
NOTES
[1] Prior and Southwest are related corporations and by agreement are treated as one entity in this proceeding and will be referred to as Prior.
[2] Scott Truck and Tractor Company of Monroe, Inc., was also named as a party defendant, but was shown to have had no involvement in the sale and it is agreed that plaintiffs' demands against that corporation were properly rejected.