452 So.2d 269 (1984)
Daniel R. WINTERROWD, Plaintiff-Appellant,
v.
The TRAVELERS INDEMNITY COMPANY, et al., Defendant-Appellants.
No. 15969-CA.
Court of Appeal of Louisiana, Second Circuit.
June 6, 1984.
Writ Granted October 5, 1984.
Writ Denied October 5, 1984.
*271 Hargrove, Guyton, Ramey and Barlow by Billy R. Pesnell and Joseph L. Shea, Jr., Shreveport, for Daniel R. Winterrowd,
Blanchard, Walker, O'Quinn & Roberts by Roy S. Payne, Shreveport, for Burl N. Boswell and The Travelers Indem. Co.,
Gold, Little, Simon, Weems & Bruser by Edward E. Rundell, Alexandria, for Rheem Manufacturing Co.
*272 Lunn, Irion, Switzer, Johnson & Salley by Frank M. Walker, Jr., Shreveport, for E.W. Bliss Co. and Aetna Cas. and Sur. Co.
Before MARVIN, JASPER E. JONES, FRED W. JONES, SEXTON and NORRIS, JJ.
SEXTON, Judge.
Plaintiff brought suit for personal injuries suffered in the malfunction of an electric powered mechanical press. The jury found in plaintiff's favor and against two defendants, and awarded judgment in the amount of $400,000. We amend, and as amended, affirm.
Plaintiff's action for the traumatic amputation of his fingers was filed on March 23, 1976. The action was brought against Burl N. Boswell, part owner and executive officer of Bosman Industries, Inc., the corporation that employed plaintiff at the time of his injury; Michael and Douglas Boswell, as executive officers of Bosman Industries, Inc.; E.W. Bliss, Co., the manufacturer that produced, constructed and marketed the mechanical press which injured plaintiff; Rheem Co., the manufacturing company that, as an owner/operator of the press, substantially altered it prior to plaintiff's injuries; Donald Brown, who owned the press briefly; and the respective insurers of the aforementioned.
Donald Brown was dismissed from the suit by a directed verdict granted by the trial court at the close of plaintiff's case-inchief. The jury found in plaintiff's favor in the amount of $400,000 against Burl Boswell, Rheem, and their respective insurers. The jury denied recovery against Bliss and Michael and Douglas Boswell. The plaintiff, Rheem and Burl Boswell have appealed.
Plaintiff contends on appeal that the jury erred in failing to find that Bliss was solidarily liable in causing plaintiff's injuries, and that the jury abused its discretion by granting an inadequate award. Defendant Rheem contends that the jury erred in holding it liable for plaintiff's injuries, and in failing to cast Bliss in judgment. Burl Boswell similarly asserts that the jury erred in finding him liable and in failing to cast Bliss. Thus the principal contentions on this appeal concern the liability of Bliss, Burl Boswell and Rheem, and the adequacy of the jurors' damage award.
Plaintiff Daniel Winterrowd, age 31, was employed as a full-time firefighter by the Shreveport Fire Department in 1973. In his off hours plaintiff performed part-time labor for additional income. On December 23, 1975, Daniel Winterrowd accepted employment with Bosman Industries operating a power press in stamping and forming charcoal pans for outdoor Cajun Cookers. On January 8, the press traumatically amputated the thumb, index and middle finger from plaintiff's left hand, and his right thumb, when it unexpectedly repeated a stroke while he was manually removing a newly trimmed charcoal pan from the dies in the bed of the press.
The mechanical press at issue was manufactured by E.W. Bliss Co. in 1907. It was a 4¾ ton metal forming mechanical press. The press itself was essentially a metal stumping device equipped with enormous mechanical power. Its principal component was a ram which stroked downward at high impact to effectuate the cutting and trimming of metal pans. The ram itself was powered by a revolving bull gear, which gear was itself turned by a narrow crankshaft, which was itself turned by an electrical engine. As the bull gear completed an entire revolution, the metal ramwhich constituted the functional component of the mechanical pressperformed a single, rapid and powerful downward stroke. The ram on the power press was utilized to trim and shape metal by the sheer downward force and impact of its stroke. To further facilitate the metal stamping or shaping process, interchangeable dies were placed on both the underside of the ram, and also on the bed of the press. When corresponding dies were placed on both the ram and the bed of the press, a single stroke of the press would produce metal shaped into the design consistently incorporated into both the upper and lower dies of the press.
*273 After being manufactured by Bliss in 1907, the mechanical press was sold to Michigan Stamping Co. (MSC) in approximately 1908. This ownership was established at trial through the sales, registry, part orders, and other recorded data which were detailed in Bliss's comprehensive business records tracing the ownership life of each of the power presses manufactured and marketed by it. It appears that between 1907 and 1925, MSC remained the owner of the press, buying several major replacement parts for it.
However, there is a gap in Bliss's records with respect to the interval between 1925 and 1938. In 1938, it appears the mechanical press at issue was purchased by Rheem Manufacturing Co. from C.M. Lockwood, Inc. In 1938, Rheem purchased a new crankshaft to install in the mechanical press. In ordering the crankshaft, Rheem did not submit the registration number of the mechanical press and request a replacement part therefore. Rheem instead designed and drew up a blueprint of the crankshaft which they wished to purchase, and thus submitted their order in the form of a blueprint. Bliss complied with the blueprint sent by Rheem, sending to Rheem a crankshaft built in accordance with the specifications of the blueprint sent it by Rheem.
After receiving from Bliss the crankshaft that had been constructed by Bliss in accordance with Rheem's blueprint specifications, Rheem attached this crankshaft to the mechanical press using a method of affixing the crankshaft which had not been utilized by Bliss in constructing the press.
After Rheem's modification, Rheem sold the press to Donald Brown, a Houston businessman, in 1974. Brown did nothing to modify the press, and indeed there is no evidence that he even used the press. He instead kept the press in storage at a warehouse in Houston.
Several months later, Boswell travelled to Houston and purchased the machine for Bosman Industries. Boswell placed a few safety guards on the press and utilized it in the Shreveport based Bosman Industries, in which corporation Boswell was a major stockholder as well as the president. Bosman Industries was engaged in the manufacture and marketing of "Cajun Cookers," smokers and other outdoor cookers. Bosman Industries utilized the mechanical power press purchased from Brown to trim pans for the outdoor cookers.

I.

The Liability of Rheem
A manufacturer is liable for injuries caused by the defective products it manufactures when such injuries are caused by the product's defective qualities and occur in the normal use or application of the product. A product is defective when it is unreasonably dangerous in normal use. In order to prevail in a products liability suit, a plaintiff must establish that the product is defectiveunreasonably dangerous in normal use, and that his injuries were caused by the product's defects in the course of the product's normal or intended application. DeBattista v. Argonaut-Southwest Ins. Co., 403 So.2d 26 (La. 1981); Philippe v. Browning Arms Co., 395 So.2d 310 (La.1981); Weber v. Fidelity & Casualty Insurance Co. of New York, 259 La. 599, 250 So.2d 754 (1971); Llewellyn v. Lookout Saddle Company, 315 So.2d 69 (La.App. 2d Cir.1975).
It is not required, in a products liability suit, that the plaintiff establish that the manufacturer has been negligent in the design or manufacture of the product. The claimant is required to prove merely the existence of a defect, and the causal link between that defect and the injuries complained of. DeBattista v. Argonaut-Southwest Ins. Co., supra; Weber v. Fidelity & Casualty Insurance Co. of N.Y., supra; Llewellyn v. Lookout Saddle Company, supra.
To these principles must be added the corollary principle that the manufacturer of a product, for purposes of products liability, includes not only the original manufacturer, but also any entity that substantially modifies or materially alters the *274 product after its original manufacture through the use of different components or methods of assembly. Thus a corporation or other entity may be cast in product liability for product modifications that engender injury-causing defects. See LeBouef v. Goodyear Tire & Rubber Co., 623 F.2d 985 (La.App. 5th Cir.1980); Spillers v. Montgomery Ward & Co., Inc., 294 So.2d 803 (La.1974).
The ram on the mechanical press was actuated by a hand lever operated by the employee. As the employee depressed the hand lever, the ram performed a single stroke. Plaintiff's fingers were amputated by a sudden, unexpected repeat or double stroke of the power ram of the mechanical press. This unexpected repeat stroke occurred while plaintiff manually removed from the die in the bed of the press a charcoal pan which had just been stamped and trimmed by a single stroke of the ram.
This repeat or double stroke of the ram occurred without an activation of the hand lever and was caused by a mechanical malfunction. This malfunction occurred in the following manner: A circular end cap was located on the end of the crankshaft to prevent the adjacent bull gear from slipping. However, the end cap slipped approximately one inch, nearly slipping off the end of the crankshaft. The bull gear thus moved laterally on the crankshaft, away from the body of the press, and towards the end of the crankshaft. The clutch mechanism is attached to, and an integral part of, the bull gear. When the bull gear slipped laterally on the crankshaft, the clutch moved also, and became disengaged because of its misalignment with the clutch latch. Because the clutch became disengaged, the crankshaft responded to the rotation of the revolving bull gear, and the continued rotation of the crankshaft caused a repeat stroke of the ram even though the hand lever had not been used. The nature of the press's mechanical malfunction was established by the expert testimony adduced at trial, as well as by a post-accident inspection of the press, and was not seriously disputed by any of the numerous mechanical experts that testified.
Rheem had materially altered the mechanical press by modifying the method which had been previously utilized to affix the end cap to the crankshaft. Rheem's modified technique of affixing the end cap to the crankshaft was implemented in 1938, upon Rheem's purchase from Bliss of a new crankshaft. After installing the new crankshaft on the mechanical press, and placing the bull gear on the crankshaft, Rheem placed a new end cap on the crankshaft, which end cap had been purchased from Bliss at the same time the new crankshaft had been purchased. However, Rheem did not affix the end cap to the crankshaft by inserting a metal dowel all the way through the end cap and the core of crankshaft as had been previously done. Rheem instead affixed the end cap to the crankshaft by placing two set screws in a hole bored in the end cap. The set screws were placed one on top of the other in the same threaded bore. Evidently, it was envisioned that by tightening the outer screw into the threaded hole, pressure would be brought to bear upon the inner set screw so that it would in turn bind upon, and catch the crankshaft, thereby securing and stabilizing the position of the end cap on the crankshaft.
The outer set screw was not the same "thread" or bore as the hole into which it was placed, the outer set screw was in fact of a slightly larger diameter than the hole. Therefore the outer set screw could not reach or extend deeply enough into the bore to bring pressure on the inner set screw. Simply stated, the outer set screw "tightened up" in the hole before it penetrated to its intended depth. Also, expert testimony indicated that the combined length of the inner and outer set screws was not sufficient to extend all the way through the bored hole in the end cap and bind upon the crankshaft that ran through the center of the end cap. We conclude that this method of affixing the end cap was defective and unreasonably dangerous precisely because it created *275 a distinct possibility of a misalignment and malfunction of the press's internal gear system, and caused an unexpected ram stroke of great and potentially crippling force in normal use which caused plaintiff's injury. We therefore agree with the finding, implicit in the jury's verdict, that Rheem's method of affixing the end cap to the crankshaft constituted a defective or unreasonably dangerous alteration sufficient to impose liability on Rheem as a manufacturer under the rubric of products liability.
Furthermore, the evidence indicates that the parties that owned the press subsequent to Rheem's attachment of the end cap by means of set screws, did not alter or modify this facet of the press's composition. Neither Donald Brown, nor Bosman Industries modified this mode of attachment. Thus, the causal link between Rheem's defective modification and plaintiff's injuries was not broken by mechanical adaptations of subsequent owners.
Rheem further contends that in ordering a crankshaft and end cap by blueprint in 1938, it was merely reproducing the method of attachment that was already in place. However, we have already described in detail how Rheem so altered the method of affixing the end cap to the crankshaft, that the end cap was not securely affixed thereon, and could not be effective in preventing lateral slippage of the bull gear away from the body of the press, or even off the end of the crankshaft. This contention is thus without merit.
Rheem also contends that the trial court erred in refusing to render certain enumerated jury charges. In our view, the instructions requested were either incorporated in the charge actually given by the trial court or were an incorrect statement of the law. Moreover, assuming arguendo the correctness of appellants' contention, errors in civil jury charges do not require a remand and retrial. It is our duty to review the entire record, and if the record supports the judgment, we are to affirm irrespective of the charge. Hunter v. Office of Health Services, Etc., 385 So.2d 928 (La.App. 2d Cir.1980); Druilhet v. Comeaux, 317 So.2d 270 (La.App. 3d Cir. 1975). As we have previously indicated, we find the evidence is more than sufficient to substantiate a finding of liability on the part of the defendant Rheem.

II.

The Liability of Burl Boswell
In analyzing the liability of defendant Burl Boswell, we have little difficulty in determining, in the first instance, that he is an executive officer of Bosman Industries. Mr. Boswell is the president and a major stockholder of Bosman Industries, and is on the board of directors thereof. Burl Boswell had express authority over plant and equipment purchases by virtue of corporate resolution. Mr. Boswell was responsible for the selection and purchasing of the metal dies used in power presses, for the safe operating condition of the presses, and for press safety guards. Mr. Boswell personally oversaw production at the Bosman plant on a day to day basis, and supervised maintenance and safety measures with respect to the mechanical presses that manufactured his company's products. Mr. Boswell personally acquired the presses used by Bosman Industries, and supervised their inspection and maintenance. See Greene v. Wright, 365 So.2d 551 (La. App. 1st Cir.1978); Hadrick v. Diaz, 302 So.2d 345 (La.App 1st Cir.1974).
An executive officer is liable to a plaintiff/employee for injuries suffered by him if:
(1) The employer owed a duty to the plaintiff, the breach of which caused plaintiff's damages,
(2) The duty was delegated by the employer to the executive officer, and
(3) The executive officer breached this duty through his own personal fault.
Greene v. Wright, supra.
We similarly have little difficulty in determining that Burl Boswell is liable, as an executive officer, for plaintiff's injuries. Using the test articulated above, we conclude *276 that plaintiff's employer, Bosman Industries, owed plaintiff a duty to provide him with reasonably safe working conditions. LSA-R.S. 23:13.[1] Moreover, we find that this duty was violated by Burl Boswell in several respects.
The record indicates that Mr. Boswell had personally instructed the plaintiff to operate the machine with his hands, and remove the finished products and metal scraps from the bed of the die manually. Although Mr. Boswell was responsible for equipment acquisitions and safety, and personally purchased the press at issue, he never ordered or conducted a thorough inspection of the machine's working parts before or after purchase. It is clear that an operator placing his hands within the moving parts of this large press possessing such great power is in serious danger if the machine repeats a stroke unexpectedly. Thus, if operators were instructed to use their hands in the placing and removal of products from the working parts of this machine, Boswell had a duty to be certain that the danger of a repeat stroke could not occur. However, the record shows that upon receipt, this machine was not inspected to rule out this possibility.
Also, the duty to provide safe working conditions where the machine's reliability was not known, could easily have been discharged by providing hand tools to allow an operator, such as the plaintiff, to remove scraps and finished products from the bed of the die without placing his hands in the path of the machine,[2] or by providing operation guards to prevent the operator's hands from penetrating the path of the press's stroke while the press was engaged.
Succinctly stated, this executive officer's duty to provide safe working conditions required that the obvious danger of a repeat stroke be precluded or that operators be furnished tools and/or guards to prevent their hands from being caught in the path of the press while in operation. See Wilson v. Aetna Cas. & Sur. Co., 401 So.2d 500 (La.App. 2d Cir.1981).
We therefore find that the employer, Bosman Industries, breached a duty to plaintiff, Daniel Winterrowd, to provide him with reasonably safe working conditions, and that the breach of this duty was a cause of plaintiff's injuries. It is clear that this duty to provide safe working conditions was delegated from the employer to this executive officer, a major stockholder, part owner and manager, who exercised complete authority over plant operations and safety. It is likewise clear that this officer was personally at fault as it was his own omissions and substandard actions which resulted in plaintiff manually operating the machinewhich had the potential *277 for a double strokewithout proper safety equipment. Therefore, the record amply supports the jury finding of liability on the part of the defendant Boswell.

III.

Liability of Bliss
A manufacturer must provide warning of any danger inherent in his product's normal use which is not within the knowledge of an ordinary user. Hebert v. Brazzel, 403 So.2d 1242 (La.1981); Chappuis v. Sears Roebuck & Co., 358 So.2d 926 (La.1978); Braxton v. Georgia-Pacific Corp., 419 So.2d 125 (La.App. 2d Cir.1982). The manufacturer of a potentially dangerous instrumentality has a duty to instruct reasonably foreseeable users with regard to its safe use. This duty exists even though the product is not defective. Amco Underwriters of Audubon Ins. Co. v. American Radiator and Standard Corp., 329 So.2d 501 (La.App. 1st Cir.1976). See also Foster v. Marshall, 341 So.2d 1354 (La.App. 2d Cir.1977). It is well established, however, that the duty to warn does not encompass dangers that are or should be obvious to the ordinary user. Foster v. Marshall, supra.
In order to recover for a manufacturer's failure to warn, a plaintiff must establish that the product engenders a risk or danger of which the manufacturer has failed to warn and that that danger is not obvious to the ordinary user. However, the user must additionally establish by a preponderance the existence of a causal connection between the failure to warn and the occurrence of plaintiff's injuries. Chappuis, supra.
We have little difficulty in finding, in the first instance, that the mechanical press here at issue engendered a substantial risk or danger. The risk or danger posed by the press was that which occurred here, an unactivated repeat or double stroke of the power ram. This danger constituted a palpable possibility because the machine was not equipped with a single stroke mechanism that might have effectively prevented a double stroke. The danger of an uninitiated double stroke was a distinct possibility for the added reason that a misalignment or disengagement of the clutch could foreseeably result in a double stroke. The conclusion that the press posed a danger is underscored by the enormously powerful and potentially crippling force of this press's power stroke. Despite the presence of this risk or danger, which inhered even in ordinary use, under normal operating conditions, Bliss placed no warning of any kind on the press.
We also find that the danger of a repeat stroke is not obvious to the ordinary user. Bliss has vigorously contended on appeal that the danger of placing one's hands in the path of the ram stroke of a mechanical press is obvious. However, this contention, although superficially accurate, is nevertheless misleading. The danger of placing one's hands in the path of the power ram is obvious when the hand lever which operates the press has been activated. However, the danger of placing one's hands in the path of the ram when the hand lever has not been activated is not obvious. The potential misalignment and disengagement of the clutch and a resulting uninitiated repeat stroke is not obvious to the ordinary user. Moreover, an ordinary user's experience with the mechanical press would strongly indicate to that user that the press performs a stroke only when activated. In summary, the danger of placing one's hands in the path of the ram strokewhen the press has not been activated by a triggering of the hand control leveris not obvious to the ordinary user.
We find, in the last instance, that plaintiff has proved by a preponderance that Bliss's failure to warn was a causal factor in his injuries. The plaintiff testified he would have abided by such warnings. We find it reasonable to conclude that this plaintiff, who had little experience with machines of this kind, would have heeded a warning from the manufacturer due to the machine's obvious potential for great harm. But most importantly, compliance *278 with warnings as to the dangers of operating the machine manually or without adequate safeguards would have prevented plaintiff's injuries. Thus, because compliance with a manufacturer's warning would have prevented plaintiff's injuries, we find that Bliss's failure to warn was a causal factor in plaintiff's injuries. It is not necessary that Bliss's failure to warn be the sole factor in causing plaintiff's injuries, in order for Bliss to be cast in judgment. Bliss's substandard conduct is actionable if it is a substantial factor in plaintiff's injuries without which the crippling injuries would not have occurred. Dixie Drive It Yourself System v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962); Amco Underwriters of Audubon Insurance Co. v. American Radiator and Standard Corp., supra.
We find for the foregoing reasons that Bliss is solidarily liable for plaintiff's injuries because of its failure to warn of dangers which were not obvious to an ordinary user.

IV.

Quantum
Plaintiff contends that the $400,000 award granted him by the jury is so inadequate as to constitute an abuse of the jury's broad discretion in determining damages.
Plaintiff, age 31, is married and has three children. He graduated from high school in 1970 as an average student. Plaintiff worked at various part-time jobs while attending junior high and high school. Upon graduating from high school, plaintiff worked at several different jobs until October of 1971, when he obtained a position as a firefighter with the Shreveport Fire Department. Plaintiff continued to work as a firefighter from the time of his employment in 1971, until he sustained the crippling injuries to his hands at Bosman Industries's Shreveport plant on January 8, 1976.
As a firefighter, plaintiff worked 24 hours and then was off work the following 24 hours in a pattern of alternating 24 hour intervals. This pattern of alternating a 24 hour work day with a day off continued for a ten day interval with plaintiff working for five days and having off five days during the ten day period. Following this ten day interval, plaintiff would have six days off before resuming a ten day period of alternating 24 hour blocks of work and off time. This work schedule is quite conducive to outside part-time employment, affording a firefighter approximately 20 off days a month on the average. Outside employment is thus a common practice among firefighters.
During the roughly four years between October of 1971 and January of 1976 that he worked as a firefighter, plaintiff performed various part-time jobs outside the Department. From October of 1971 until October of 1972, plaintiff worked part-time for a drapery hanging service. Plaintiff unloaded rail cars for the Kansas City Southern Railroad from October of 1972 until December of 1973, at which time plaintiff lost his job when the railroad laid off numerous workers in an employee cutback. Plaintiff performed no other parttime work until he was employed by Bosman Industries on approximately December 15, 1975. Plaintiff proceeded to work for Bosman Industries for some three weeks at the rate of $3.50 an hour, until he sustained his injuries on January 8, 1976.
Following the January 8, 1976 accident, plaintiff remained out of work for an entire year, recuperating from his injuries. He resumed employment with the Shreveport Fire Department in January of 1977 as a communications and dispatch officer. Plaintiff earned approximately $22,100 at that position in 1982, but has not performed any part-time work since sustaining his injuries in the industrial accident at Bosman Industries in January of 1976.
Plaintiff obtained part-time earnings of $1,482 in 1972, $2,228 in 1973, no part-time earnings in 1974, and part-time earnings of $98 in 1975; his part-time earnings in the first eight days of 1976 totalled something less than $270.
*279 Plaintiff has no post-high school education. Expert testimony established that he does not have the scholastic skills necessary to be a successful student on the collegiate level, and that his injury has drastically impaired his employability in the blue collar positions in which he previously labored on a part-time basis.
Before an appellate court can disturb a quantum award, the record must clearly reveal that the trier of fact abused its discretion in making the award. An award made in the trial court may not be modified unless it is unsupported by the record. The appellate question is not whether a different award may have been more appropriate, but whether the trial court's award can be reasonably supported by the record. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Bitoun v. Landry, 302 So.2d 278 (La.1974); Miller v. Thomas, 258 La. 285, 246 So.2d 16 (1971); Black v. Ebasco Services, Inc., 411 So.2d 1159 (La.App. 1st Cir.1982); Greene v. Wright, 365 So.2d 551 (La.App. 1st Cir. 1978). Moreover, the appellate function in reviewing quantum is limited to raising inadequate awards to the lowest amount the trial court could have reasonably awarded, and lowering excessive awards to the highest amount the trial court could have reasonably awarded. Reck v. Stevens, 373 So.2d 498 (La.1979); Coco v. Winston Industries, Inc., supra; Alexander v. Leger, 423 So.2d 731 (La.App. 3d Cir.1982); Greene v. Wright, supra.
Since the jury award was not itemized, in order to determine whether plaintiff's award is the lowest acceptable amount which the jury could assess on the evidence, we first of all look to the proof of the specific items of special damage and subtract those from the total in order to evaluate the adequacy of general damages and wages lost from prospective part-time employment.
Plaintiff incurred proven medical expenses and lost wages of $10,374 and $11,340, respectively, from the loss of his fulltime earnings from the date of his injury on January 8, 1976, until he resumed employment with the Shreveport Fire Department in January of 1977.
These two sums equal just under $22,000. Subtracting this total from the award of $400,000, leaves approximately $378,000. It is our task to determine if this sum is adequate to compensate plaintiff for loss of future part-time wages and general damages.
The burden is on the plaintiff to prove that because of his disability he will suffer a loss of income. Holmes v. Texaco, Inc., 422 So.2d 1302 (La.App. 5th Cir.1982); Profit v. Linn, 346 So.2d 253 (La.App. 1st Cir.1977). In evaluating plaintiff's evidence, we are to consider his physical condition prior to the accident, his work record, the extent of his earnings, and the probability that he would have earned similar sums in future years except for his disability. Viator v. Gilbert, 253 La. 81, 216 So.2d 821 (1968).
Defendants' expert set plaintiff's loss of part-time earning capacity at $76,000. On the other hand, plaintiff's expert estimated the loss of that capacity to be $420,000, and included in his projection the assumption that plaintiff would have worked full-time after retirement. Defendants' expert discounted plaintiff's award at the rather high rate of ten percent. The plaintiff's expert assumed plaintiff would have utilized almost every day off in part-time labor.
The plaintiff contends that $200,000 in general damages is the lowest supportable award. Assuming arguendo the correctness of this position, substracting this sum from the $378,000 left after special damages are deducted leaves a balance of $178,000 as an award for loss of future wages. We cannot say that this sum is inadequate as an abuse of discretion for the award of future wages here. Viator v. Gilbert, supra.

V.

Summary and Decree
In summary, we affirm the jury's finding of liability on behalf of the defendant *280 Rheem and the defendant Boswell and determine that the jury erroneously failed to find liability on the part of the defendant Bliss. We will therefore amend the judgment to cast Bliss and its insurer, Aetna, in solido with the other defendants. It will furthermore be necessary to recast that part of the judgment reflecting contribution. The defendants Boswell and their insurer, The Travelers, and Rheem Manufacturing Company both filed third party demands against each other and Bliss. However, our search of the voluminous record indicates that Bliss only filed a third party demand against Boswell, and not against Rheem.
Therefore, the decree portion of the judgment herein will be amended to read as follows:
"IT IS ORDERED, ADJUDGED AND DECREED that the aforesaid verdict be and is hereby made the judgment of this court; and that, accordingly, there be judgment herein in favor of plaintiff Daniel R. Winterrowd, and against defendants Burl N. Boswell, and his insurer, The Travelers Indemnity Company, and Rheem Manufacturing Company, and E.W. Bliss Company, and its insurer, Aetna Casualty and Surety Company, in solido, for the full sum of Four Hundred Thousand and No/100 ($400,000) Dollars, together with legal interest thereon from January 7, 1977, the date of judicial demand, until paid, and for all costs of these proceedings.
"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of defendants Douglas Merle Boswell and David Michael Boswell, and against plaintiff Daniel R. Winterrowd, dismissing the claims of Daniel R. Winterrowd at his cost and expense.
"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that intervenor, The Travelers Insurance Company, is awarded the sum of Forty One Thousand Thirty-Three and 06/100 ($41,033.06) Dollars for workmen's compensation benefits and medical expenses paid to or on behalf of plaintiff through February 25, 1983, which sum is awarded in preference and priority out of the above mentioned judgment in favor of plaintiff Daniel R. Winterrowd, together with legal interest, to be paid from the date of judicial demand by intervenor as to the portion of said sum paid prior to December 8, 1977, and with legal interest on the remainder of said sum to be paid from the date payment was made by intervenor. Intervenor shall further be entitled to a credit, in the amount of any sums paid to plaintiff pursuant to the judgment herein, against any obligation for future payments to or on behalf of plaintiff under the workmen's compensation laws.
"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there will be judgment herein in favor of the third-party plaintiffs Burl N. Boswell and The Travelers Indemnity Company, and against the third-party defendant Rheem Manufacturing Company; and against the third-party defendant E.W. Bliss Company and Aetna Casualty and Surety Company; for contribution of one-third each of the judgment herein rendered in favor of the plaintiff.
"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of the third-party plaintiff Rheem Manufacturing Company and against the third-party defendant Burl N. Boswell and The Travelers Indemnity Company; and against the defendant E.W. Bliss Company and Aetna Casualty and Surety Company; for contribution of one-third each of the judgment herein rendered in favor of the plaintiff.
"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of the third-party plaintiff E.W. Bliss Company and Aetna Casualty and Surety Company, and against the third-party defendant Burl N. Boswell and The Travelers Indemnity Company for contribution of one-third of the judgment herein rendered in favor of the plaintiff.

*281 "IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all other claims and third-party claims be dismissed with prejudice at the cost of the parties asserting same."
"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the costs herein are to be borne equally by the defendants Rheem Manufacturing Company, E.W. Bliss Company, and Burl N. Boswell, and their respective insurers, as appropriate."
AMENDED, AND AS AMENDED, AFFIRMED.
MARVIN, J., concurs in part and dissents in part, and assigns written reasons.
MARVIN, Judge, concurring in part and dissenting in part.
I concur in the majority opinion except insofar as it reverses the trial court judgment and holds Bliss solidarily liable with the other defendants.
The majority correctly states in the second paragraph under the heading "Liability of Bliss," that in order for a plaintiff-user of the press to recover against Bliss because of its failure to warn of a non-obvious danger, the plaintiff
"must additionally establish by a preponderance the existence of a causal connection between the failure to warn and the occurrence of plaintiff's injuries."
There is substantial evidence in this record upon which the jury could reasonably have concluded that this burden had not been met by plaintiff or by third party plaintiffs. There is considerable dispute over what caused the press to double stroke and certainly a reasonable mind could conclude that Bliss's failure to warn was not a cause in fact or in law of the plaintiff's injury. We do not reverse a trier of fact in the absence of clear error. I see no clear error in the jury verdict or judgment with respect to Bliss and would affirm in that respect.
NOTES
[1] LSA-R.S. 23:13 reads as follows:

§ 13. Employers' duty as to safety
Every employer shall furnish employment which shall be reasonably safe for the employees therein. They shall furnish and use safety devices and safeguards, shall adopt and use methods and processes reasonably adequate to render such employment and the place of employment safe in accordance with the accepted and approved practice in such or similar industry or places of employment considering the normal hazard of such employment, and shall do every other thing reasonably necessary to protect the life, health, safety and welfare of such employees. Nothing in this Section shall apply to employment in private domestic service or to agricultural field occupations.
[2] The ANSI standards promulgated by the American National Standards Institute represent precautionary measures adopted through the consensus of government agencies, industrial concerns, labor representatives and insurance companies. Section 6.1.2 of ANSI B11.1 standards effective in 1976 with respect to "safety requirements for the construction, care, and use of mechanical power presses" provides in part that:

"It shall be the responsibility of the employer to institute ... procedures that will eliminate... the need for the operator to place his hands or fingers within the point of operation."
The comment to Section 6.1.2 states that "A primary objective of this standard is to eliminate exposure of operator's hands or fingers to the hazards within the point of operation." Such standards, while not definitive in assessing liability, do provide guidelines for determining negligence. See generally, Parker v. South La. Contractors, Inc., 370 So.2d 1310 (La.App. 1st Cir.1979).